**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

A.S.,

                          Plaintiff,               1:21-cv-620 (BKS/ATB)

v.

CITY SCHOOL DISTRICT OF ALBANY, CITY
SCHOOL DISTRICT OF ALBANY BOARD OF
EDUCATION, LORI MCKENNA, in her individual
capacity, DALE GETTO, in her individual capacity,
ANNE SAVAGE, in her individual capacity, and
JEFFREY HONEYWELL, in his individual capacity,

                          Defendants.

---

**Appearances:**

*For Plaintiff:*
Rebecca J. Houlding
Giselle B. Schuetz
Friedman & Houlding LLP
1050 Seven Oaks Lane
Mamaroneck, NY 10543

*For Defendants City School District of Albany, City School District of Albany Board of Education, Lori McKenna, Dale Getto, and Anne Savage:*
Loraine C. Jelinek
Gregg T. Johnson
Johnson & Laws, LLC
646 Plank Road, Suite 205
Clifton Park, NY 12065

*For Defendant Jeffrey Honeywell:*
Frank W. Miller
Giancarlo Facciponte
The Law Firm of Frank W. Miller, PLLC
6575 Kirkville Road
East Syracuse, NY 13057

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.   INTRODUCTION

Plaintiff A.S.[1] brings this action asserting various claims under 42 U.S.C. § 1983 and

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"), based

upon events that occurred while she was a minor attending Albany High School. (Dkt. No. 1).

Presently before the Court are two motions to dismiss Plaintiff's Complaint pursuant to Federal

Rule of Civil Procedure 12(b)(1) and 12(b)(6), filed by (1) Defendants City School District of

Albany ("CSDA"), City School District of Albany Board of Education (the "Board") (together,

"the District"),[2] Lori McKenna, Dale Getto, and Anne Savage (collectively, the "District

Defendants"); and (2) Defendant Jeffrey Honeywell. (Dkt. Nos. 35, 41). Plaintiff has opposed the

motions, (Dkt. No. 48), and Defendants have responded, (Dkt. Nos. 61, 62). For the following

reasons, the District Defendants' motion is granted in part and denied in part, and Attorney

Honeywell's motion is granted.

## II.   FACTS[3]

### A.   2014–2015 School Year

In the fall of 2014, Plaintiff entered Albany High School as a freshman. (Dkt. No. 1, at

¶ 51). One of Plaintiff's classmates was a male student ("MS"); Plaintiff and MS were not

acquainted before beginning high school but both participated in Jazz Ensemble their freshman

---

[1] On October 22, 2021, United States Magistrate Judge Andrew T. Baxter granted Plaintiff's motion to proceed under a pseudonym. (Dkt. No. 65). Plaintiff, her parents, others referenced by generic names or initials in the Complaint, and other individuals who were minors at the time of the relevant conduct are not identified by name. (*Id.*).

[2] The parties treat the District and the Board as the same Defendant, (*see* Dkt. No. 35-9, at 10 & n.1), and the Court does the same in this decision.

[3] The facts are drawn from the Complaint. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

year. (*Id.* ¶¶ 52–53). Both students played the piano and often shared a piano bench. (*Id.* ¶ 53). MS at times "physically took over" the piano, forcing Plaintiff to move out of the way, and on one occasion he "began screaming profanities" at Plaintiff. (*Id.* ¶¶ 55–56). Although the student teacher present during this incident is believed to have informed the teacher, the incident was not reported to the administration. (*Id.* ¶¶ 56–59).

### B.     2015–2016 School Year

In September 2015, MS told "Student Victim 3" that he had written a song. (*Id.* ¶ 61). MS sent the song to Student Victim 3 upon her request; the song suggested that MS had raped Student Victim 3. (*Id.*). Upset, Student Victim 3 confided in Plaintiff about the song, but both were afraid to report the song because of MS's mother, who was a friend of Dale Getto, the Acting Principal at Albany High School, and also an elected member of the Board (referred to as the "Board President"). (*Id.* ¶ 62; *see also id.* ¶¶ 19 (alleging that MS's mother served as Vice President of the Board from January 2016 to January 2017, when she was elected President), 28 (noting that Getto was Acting Principal until January 2018)).[4]

On or about December 1 and 2, 2015, MS distributed to male classmates "text messages describing rape fantasies" that specifically referenced Plaintiff (the "December 2015 texts"). (*Id.* ¶ 63). The December 2015 texts referenced "quasi-abduct[ion]," bondage, and chloroform, and used the word "mercilessly" to describe MS's actions in the fantasy. (*Id.* ¶¶ 63–64). Around the same time, a male classmate provided copies of the December 2015 texts to Plaintiff, who was "embarrassed," "frightened," and "afraid to report" the texts. (*Id.* ¶¶ 65–66).

---

[4] The Court notes, but does not discuss in detail, the many allegations in the Complaint regarding MS's allegedly improper behavior toward third parties of which Plaintiff and/or Defendants were aware. (*See, e.g.*, *id.* ¶¶ 69–72, 75–81, 211–12, 215–16).

Also during sophomore year, MS asked his Chemistry teacher "how to make chloroform." (*Id.* ¶ 67). Students in the class were aware of the December 2015 texts and their reference to chloroform and informed Plaintiff about MS's question. (*Id.* ¶ 68).

In Spring 2016, MS "forcibly grabbed and held [Plaintiff's] arm during Jazz Ensemble class." (*Id.* ¶ 73). Plaintiff did not report this incident, "lacking faith that [the Board President's] friend, Principal Getto, would take any action." (*Id.*). During this same time period, MS "loudly" asked Plaintiff: "do you want to be my dominatrix?" (*Id.* ¶ 74). MS also "loudly" "joked" with male classmates during class, "repeatedly and dramatically using the word 'mercilessly' in various comments to his peers." (*Id.* ¶ 82). Plaintiff overhead these comments and was "retraumatized by them." (*Id.* ¶ 83). Plaintiff "mustered up her courage and confronted" MS, who "admitted" that he wrote the December 2015 texts. (*Id.* ¶ 84).

### C.     2016–2017 School Year

In Fall 2016, MS was "appointed to serve as an Assistant Volunteer Coach with the varsity [football] team." (*Id.* ¶ 87). He accessed the school PA system and played "inappropriate songs over the speaker with slurs and offensive language demeaning to women." (*Id.*). The Assistant Boys Varsity Soccer Coach directed MS to stop; MS in turn "reported that he was yelled at by the coach," who was then "removed from his coaching position for the rest of the season." (*Id.* ¶ 90). Plaintiff alleges this is "indicative of what happens to teachers and staff members when they take action to enforce school rules and the laws vis a vis" MS. (*Id.*).

On or about November 6, 2016, Plaintiff "confronted" MS about the December 2015 texts. (*Id.* ¶ 93). She wrote: "[The rape story] freaked me out and I couldn't even look at you for the longest time. What you did was disgusting and I was scared." (*Id.*). MS responded: "Yeah, I know it's awful. . . . I'm immeasurably sorry. . . . It was a terrible, thoughtless action on my part to not only think up such a thing, but to share it." (*Id.* ¶ 94).

On or about November 17, 2016, the Board approved a proposal to hire MS as a CSDA employee for the 2016–2017 school year as a paid lifeguard. (*Id.* ¶ 95).[5] Around the same time, students became aware that MS had "obtained copyrighted AP test materials and answers and sold" them to other students. (*Id.* ¶ 96). Plaintiff reported this information to the teacher and indicated "she was worried about retaliation from [MS's] mother, who was an attorney" as well as Vice President of the Board. (*Id.* ¶ 98). MS "ultimately admitted" to purchasing the test questions and answers from a website, and the Board President also checked credit card receipts and "confirmed" to the teacher that MS had made the purchase. (*Id.* ¶¶ 99–101).

On January 9, 2017, "Student Victim 2" and another student went to see School Psychologist, Dr. Jamie Savoie, about MS. (*Id.* ¶ 109). The two students told Dr. Savoie that MS "had pornographic fantasies about another student [Plaintiff]" which he had put in story form and shared with other students. (*Id.*). They also informed Dr. Savoie of MS's behavior toward Student Victim 2, including refusing to leave her alone and making inappropriate comments about penis size. (*Id.*). Dr. Savoie brought the students to see Assistant Academy Principal Suzann Cornell, and they showed Assistant Principal Cornell the December 2015 texts. (*Id.*). Assistant Principal Cornell used her phone to take pictures of the December 2015 texts; no one informed law enforcement of the texts. (*Id.* ¶¶ 110–11). MS subsequently "implored Student Victim 2 to tell administrators she had lied" in her report, but she refused to do so. (*Id.* ¶ 112).

Defendants did not inform Plaintiff or her parents that a report had been made regarding the December 2015 texts; nor did they investigate the texts or file a complaint on Plaintiff's behalf under New York's Dignity for All Students Act ("DASA"). (*Id.* ¶¶ 113–14). Plaintiff also alleges that no disciplinary action was taken against MS and that Defendant Honeywell, retained

---

[5] On or about August 17, 2017, MS was "rehired" as both a lifeguard and assistant football coach. (*Id.* ¶ 255).

counsel for CSDA, was informed of the allegations. (*Id.* ¶¶ 119, 121). Defendants told Student Victim 2 that MS had "agreed" to stay away from her and also instructed that Student Victim 2 should "stay away from" MS. (*Id.* ¶¶ 122–23).

On February 12, 2017, the Board President went to Plaintiff's home and informed Plaintiff and her parents that the Board President knew Plaintiff had reported MS for academic dishonesty. (*Id.* ¶ 137). The Board President threatened to sue for defamation and told the family that, despite her status as both President of the Board and MS's mother, she would be personally involved in any District investigation. (*Id.*). She told the family they should "try to get along" and "agree that the issue does not leave this room." (*Id.*).

In late winter or early spring of 2017, MS walked over to Plaintiff after a history test and said: "You have the tits and ass of an 80-year-old man." (*Id.* ¶ 138). Plaintiff would later report this incident in May 2017. (*Id.* ¶ 139). Around this time MS would also "walk near" Plaintiff and "talk to" her unnecessarily. (*Id.* ¶ 140). On a school choir trip to a festival in Long Island in May 2017, MS stood "unnecessarily" behind Plaintiff during the school's performance. (*Id.* ¶ 144).

On May 22, 2017, during an AP United States History class, the discussion "centered on women's rights, the Equal Rights Amendment, the Clinton impeachment, and Monica Lewinski." (*Id.* ¶ 145). During that class, MS sent "multiple sexually hostile, misogynistic texts" about Plaintiff and Student Victim 2 that "referenced their bodies, oral sex, mutilation, Viagra-fueled rape, and noise-cancelling headphones" (the "May 2017 texts"). (*Id.* ¶ 146). MS sent these texts to male classmates who "disrupt[ed] class with their laughter." (*Id.*). Plaintiff asked what was so funny, and, later, a student told her: "[MS] is writing about you again." (*Id.* ¶ 147).

The next day, Student Victim 2 complained to Dr. Savoie, showing her copies of both the December 2015 texts and the new May 2017 texts. (*Id.* ¶ 150). Dr. Savoie emailed the copies to

Vice Principal Commerford. (*Id.*; *see also id.* ¶ 29 (alleging that Jodi O'Connor Commerford served as Vice Principal of Albany High School from May 2017 to January 2018, when she became Principal on a probationary basis)). On or about May 24, 2017, Student Victim 2 also reported the text messages to Assistant Principal Cornell. (*Id.* ¶ 151). Student Victim 3 also reported the "song" MS had written about her to Vice Principal Commerford. (*Id.* ¶ 153). In response, Vice Principal Commerford "discouraged" Student Victim 3 from making a formal report, implying that the Board President had a "litigious" nature, and stated that Defendants would take no action against MS because Student Victim 3 had "asked [MS] to send the song." (*Id.*). Also on May 24, 2017, Vice Principal Commerford met with a male classmate, who informed her he had been shown the May 2017 texts in class and that "the behavior was not out of the ordinary" for MS. (*Id.* ¶ 155).

On or about May 24, 2017, Plaintiff went with another student to see Vice Principal Commerford. (*Id.* ¶ 154). They explained that they had heard a "student might be getting paid by [MS] to lie to the administration." (*Id.* ¶ 154). The next day, MS sent Snapchat messages to "numerous" classmates referring to this student as a "snitch." (*Id.* ¶ 182). Plaintiff and another witness shared the Snapchat story with Vice Principal Commerford. (*Id.* ¶ 184).

On May 24, 2017, Plaintiff also reported to Vice Principal Commerford that MS had "for years verbally harassed her and others, had on at least one occasion physically grabbed her[,] and had written violent rape texts targeting her that dated back to either 2015 or 2016." (*Id.* ¶ 156). Vice Principal Commerford "discouraged" Plaintiff from providing copies of the December 2015 texts and "downplayed their seriousness." (*Id.* ¶ 157). Although Vice Principal Commerford did not launch "a full investigation," she insisted that Plaintiff start seeing Dr. Savoie. (*Id.* ¶ 158).

On May 26, 2017, in what was CSDA's first contact with Plaintiff's family regarding MS's behavior, Vice Principal Commerford called Plaintiff's father. (*Id.* ¶ 185). Vice Principal Commerford provided "only a vague, generalized description" of the May 2017 texts, describing the situation as "two young men exchanging inappropriate texts" about Plaintiff and another classmate. (*Id.*). Vice Principal Commerford did not mention the December 2015 texts, other conduct reported by Plaintiff, DASA, or Title IX. (*Id.*). She did not provide copies of any of MS's texts or inform Plaintiff's parents of any complaint procedures. (*Id.*). Plaintiff's mother called Vice Principal Commerford the following week. (*Id.* ¶ 187). Vice Principal Commerford told Plaintiff's mother: "I probably should not be telling you this. I just got my position and I'm not used to dealing with this sort of problem." (*Id.*). Vice Principal Commerford also said that Academy Principal Julie Barber (the high school's designated DASA coordinator) and Acting Principal Getto had both recused themselves from the investigation, which Vice Principal Commerford would be handling. (*Id.* ¶ 188). Plaintiff alleges it is "unknown" whether Vice Principal Commerford had "any training on best practices for thoroughly investigating potential violations of DASA/Title IX before this time." (*Id.* ¶ 189).

Plaintiff alleges that the Board President spoke with Vice Principal Commerford and Acting Principal Getto about the text messages, and that Attorney Honeywell was informed about the texts and spoke with Vice Principal Commerford. (*Id.* ¶¶ 161–62). Although Plaintiff does not allege exactly when, she "later report[ed]" to Defendants "that the 2015 rape texts kept reappearing and being discussed at various times over the course of many months." (*Id.* ¶ 160). The texts "were the source of immense shame, embarrassment, fear, and anxiety." (*Id.*). However, Defendants "repeatedly refused to take action to investigate those text messages," instead "focusing solely and exclusively" on the May 2017 texts. (*Id.*; *see also id.* ¶ 172).

Similarly, Plaintiff met with Vice Principal Commerford over "several dates during late May 2017 and early June 2017," when she discussed "multiple incidents" involving MS that had "happened over the years—concerning verbal, electronic, and physical harassment" of herself and others. (*Id.* ¶ 205). Plaintiff also discussed the negative impact MS's conduct had. (*Id.*). Although Vice Principal Commerford already had copies of the December 2015 texts, she discouraged Plaintiff from obtaining copies of the texts. (*Id.* ¶¶ 206–07).

Plaintiff alleges there is no evidence that MS was disciplined in connection with any of the text messages or any other sexually harassing conduct. (*Id.* ¶ 166). Defendants did not give MS a "formal in-school suspension"; rather, the Board President arranged for MS to be placed in a conference room, where he had his cell phone and laptop with him. (*Id.* ¶¶ 163–65).

After the May 2017 reports, administrators informed Plaintiff and Student Victim 2 that a Stay Away Directive ("SAD") was put in place and signed by MS and his parent. (*Id.* ¶ 168). Defendants told the two students that the May 2017 SAD would be "shared with all relevant teachers" and would "stay in place through June 30, 2018," when the students were expected to graduate. (*Id.* ¶ 169). However, Defendants "did not make teachers aware of the SAD," alert the school security office, or place the SAD in the "online repository" as they were supposed to. (*Id.* ¶¶ 173–75).

### 1.      Enforcement of the SAD and Further Harassment

Plaintiff alleges multiple instances where Defendants failed to effectuate the SAD. At a May 31, 2017, school-sponsored music recital, for example, Defendants "allowed [MS] to perform" in "close proximity" to Plaintiff and Student Victims 2 and 4. (*Id.* ¶¶ 191–93). The music teachers present at the recital were not informed of the SAD. (*Id.* ¶ 194).

On or about June 3, 2017, Plaintiff and MS arrived at school to take the SAT at the same time. (*Id.* ¶ 209). MS "purposefully walked close to Plaintiff" on the sidewalk, despite the fact

that there were no other students nearby and no need to come close to her. (*Id.*). In further

violation of the SAD, Plaintiff had to take the test in the same room as MS, causing her "stress

and distraction" and "likely affecting" her SAT scores. (*Id.* ¶ 210).

On June 6, 2017, MS again violated the SAD when he "walked up to and hovered over"

Plaintiff while students were engaged in group work during a history class. (*Id.* ¶ 217). Plaintiff

told her history teacher about the SAD. (*Id.* ¶ 218). The history teacher subsequently met with

Vice Principal Commerford about MS's violation of the directive. (*Id.* ¶ 219).

Because her history teacher was unaware of the SAD, Plaintiff suspected none of her

teachers had been informed of its existence. (*Id.* ¶ 220). Plaintiff's mother requested a meeting

with Plaintiff's teachers, where she informed them about the SAD. (*Id.* ¶ 221). The teachers were

previously unaware of its existence (*Id.*).

Shortly after this meeting, MS violated the directive again by approaching Plaintiff at the

school's athletic banquet and speaking with the person with whom Plaintiff had been speaking.

(*Id.* ¶ 224). Although the Board President was nearby and was watching, she did not intervene.

(*Id.*). Plaintiff reported this violation to Vice Principal Commerford on June 9, 2017. (*Id.*).

## 2.    Office of Civil Rights Resolution Agreement

In or around June 2017, CSDA entered into a "Resolution Agreement (02-17-1048)" with

the U.S. Department of Education Office of Civil Rights ("OCR") regarding implementation of

Title IX. (*Id.* ¶ 198). The OCR had found that CSDA's procedures "did not conform to Title IX's

implementing regulations," the DASA coordinator had "failed to identify certain complaints as

complaints of 'sexual harassment'" and did not properly investigate those complaints, and CSDA

had "failed to notify the complainant of the outcome of its investigations" on "various

occasions." (*Id.*). In the Resolution Agreement, CSDA agreed to taking certain steps to fulfill its

obligations. (*Id.* ¶ 199).

### 3.    DASA Complaints

On May 24, 2017, Vice Principal Commerford "supposedly completed a DASA form in connection with [Plaintiff's] complaint," but she did not tell Plaintiff's family that she had done so. (*Id.* ¶ 179). Defendants never provided a copy of CSDA's DASA complaint to Plaintiff or her family directly, although the family later received a copy in October 2017. (*Id.* ¶ 180).

After Plaintiff's parents first learned about the December 2015 texts on June 10, 2017, they learned they could make a DASA complaint. (*Id.* ¶¶ 226–27). Plaintiff and her family submitted a DASA complaint regarding the May 2017 texts on June 12, 2017. (*Id.* ¶ 227). Vice Principal Commerford called the next day asking "whether she should accept" this complaint, because she had already completed one, and she stated that the investigation was complete. (*Id.* ¶ 228). Plaintiff's parents insisted on filing their own complaint. (*Id.*). Also on or around June 13, Vice Principal Commerford met with Plaintiff in her office to "warn her that [MS's] parents were upset" with her. (*Id.* ¶ 229).

On June 18, 2017, MS "and/or his parents" filed a DASA complaint against Plaintiff, claiming she had bullied MS. (*Id.* ¶ 231). Acting Principal Getto notified Plaintiff that she had been accused of bullying by a letter mailed on June 30, 2017. (*Id.* ¶ 237). The letter advised Plaintiff and her family that a "complaint ha[d] been filed" against her, the "administration [was] obligated to investigate" the complaints, and the administration would be "reaching out over the summer" to discuss the details of the complaint and afford Plaintiff a chance to respond. (*Id.* ¶ 238). However, the letter "did not provide any notice of the specific allegations." (*Id.* ¶ 237). Plaintiff alleges that Defendants "have never specified what the allegations were" and, "contrary to Board policy," never informed Plaintiff in writing that she was "cleared of all allegations." (*Id.* ¶¶ 239, 250, 286–87).

By June 23, 2017, Vice Principal Commerford had "cleared" MS of violating DASA, concluding "he had not engaged in sexual harassment." (*Id.* ¶ 233). In her letter to MS and his parents, Vice Principal Commerford did not mention "any violation of the school's Code of Conduct," although she would later acknowledge to Plaintiff and her family that MS had violated the Code. (*Id.*). On June 28, 2017, Acting Principal Getto and Vice Principal Commerford "issued a report in connection with [Plaintiff's] DASA complaint." (*Id.* ¶ 234). They concluded that the May 2017 texts constituted a "lone incident" and that the "story writing" incident "could not be corroborated." (*Id.*).

On July 27, 2017, Plaintiff and her family "formally appealed" Acting Principal Getto and Vice Principal Commerford's "initial school-level decision" on her DASA complaint to Superintendent Kimberly Wilkins. (*Id.* ¶ 244). The appeal was "date and time stamped" at the "District's One Academy Park office," but CSDA "later claimed to have misplaced" it. (*Id.* ¶ 245). Plaintiff alleges that CSDA never provided the appeal to outside counsel or the Board. (*Id.*).

On or around August 1, 2017, Plaintiff and her parents met with Vice Principal Commerford and Dr. Savoie. (*Id.* ¶ 249). They asked which student had filed the DASA complaint against Plaintiff, and Vice Principal Commerford "identified" MS. (*Id.*).

### 4.     Superintendent Involvement and Outside Counsel Investigation

On June 29, 2017, Plaintiff's parents met with Honeywell Law Firm attorney Kate Howard, Superintendent Wilkins, and Assistant Superintendents Lori McKenna and Cecily Wilson-Turner. (*Id.* ¶ 235). They discussed both the December 2015 and May 2017 texts, and Plaintiff's parents explained that Acting Principal Getto and Vice Principal Commerford possessed copies of the texts. (*Id.*). On June 30, 2017, Superintendent Wilkins secured her own copies of the texts. (*Id.* ¶ 236). At some point, Plaintiff's parents provided materials to

Superintendent Wilkins, including the December 2015 texts, the June 30 letter indicating a DASA complaint had been filed against Plaintiff, a copy of Attorney Honeywell's retainer agreement with CSDA, and a request for an independent investigator. (*Id.* ¶ 240).

On or about July 18, 2017, Superintendent Wilkins "authorized outside counsel" to investigate MS's conduct "going back to at least December 2015." (*Id.* ¶ 241). Superintendent Wilkins also assured Plaintiff and her family that "Plaintiff would have no classes with [MS]" and the school would issue a "Safety Plan" in addition to the May 2017 SAD. (*Id.* ¶ 243).

On July 28, 2017, Plaintiff requested in writing that, during the upcoming school year, MS be "prohibited from approaching Plaintiff," a Safety Plan be distributed to teachers and other school staff, Plaintiff be provided "separate transportation" to school-sponsored events, and there be "consequences written into the Safety Plan" for any violations. (*Id.* ¶ 246). Defendants "did not honor a single one of these requests." (*Id.* ¶ 247).

In mid-August, Superintendent Wilkins left her position, and Attorney Honeywell informed her that "the investigation into [MS's] conduct was no longer her concern." (*Id.* ¶ 251). After Superintendent Wilkins's departure, outside counsel was "constrained to *only* investigate" the May 2017 texts. (*Id.* ¶ 252).[6] The new Superintendent, Kaweeda Adams, "deferred oversight" to issues concerning MS to Assistant Superintendent McKenna. (*Id.* ¶ 253; *see also id.* ¶ 16).

---

[6] In October 2017, Plaintiff and her father met with attorney Kathy Ahearn, whom CSDA hired as outside investigator. (*Id.* ¶ 296). Ms. Ahearn offered to show Plaintiff certain text messages provided by the Board President, but Plaintiff did not want to "interrupt her narrative." (*Id.*). CSDA later refused to provide Plaintiff with copies of these texts. (*Id.* ¶¶ 296, 328).

### D.    2017–2018 School Year

#### 1.    Class Schedules

On August 23, 2017, Plaintiff's guidance counselor informed her parents that Defendants had "verbally implemented" a new policy which would allow students to enroll in "only one music class for fifth period." (*Id.* ¶ 258). In prior years, students could enroll in two music classes. (*Id.*). This new policy meant that Plaintiff could not enroll in both the "Albanettes (female a capella group) and Jazz Ensemble." (*Id.*). Plaintiff's parents contacted the music teachers, who had not heard of the new policy and were concerned about the policy's impact on ensemble size. (*Id.* ¶ 259).

Around the same time, Defendants "canceled a required second year IB class (History HL 2)" that was needed to "obtain an International Baccalaureate certificate and/or diploma." (*Id.* ¶ 262). This cancelation occurred despite Acting Principal Getto's statements at an April 2017 Board meeting indicating that students who had begun the school's IB programs "would be allowed to finish them" and that IB History HL 2 would be offered in the 2017–2018 school year. (*Id.* ¶ 261). Defendants stated that the cancelation was due to "low-enrollment," but one student was allowed to take the class. (*Id.* ¶ 262). Plaintiff alleges that Defendants canceled the class in retaliation for her complaints and because MS "would not have been allowed to participate" in light of the restrictions on his enrollment in the same classes as Plaintiff and other students. (*Id.* ¶¶ 263, 265).

#### 2.    Safety Plan and Violations of the SAD

Prior to the start of senior year, Plaintiff sang the National Anthem at the beginning of a school football game. (*Id.* ¶ 266). MS "walked approximately forty yards down the side of the field, stopping behind Plaintiff," and remained in "close proximity" to her in violation of the SAD. (*Id.*). Superintendent Adams, an Assistant Superintendent, Acting Principal Getto, and the

Board President witnessed MS's behavior but took no action; Defendants also failed to take action after Plaintiff's family reported the event to Assistant Superintendent McKenna after the event. (*Id.* ¶¶ 266–67).

On September 6, 2017, Defendants completed and signed a Safety Plan ("SP") designed to protect Plaintiff. (*Id.* ¶ 268). However, Defendants ordered Plaintiff and her family "not to share it with anyone." (*Id.*). Assistant Superintendent McKenna told Plaintiff's parents that if the document "became public," the "District and Board would know who 'leaked it.'" (*Id.*). Throughout the year, Defendants "repeatedly refused to share" the SP or SAD with teachers and security. (*Id.* ¶ 269).

Plaintiff alleges multiple incidents throughout her senior year where MS violated the SP or SAD. On September 14, 2017, for example, teachers "invited [MS] into the music classroom" where Plaintiff was already scheduled for class. (*Id.* ¶ 270). Plaintiff therefore did not enter the classroom or attend class that day. (*Id.*). Plaintiff was "upset" and attempted to report the violation to "designated 'point' people" identified in the SP but was unable to do so. (*Id.*). Plaintiff ultimately reported the incident to her guidance counselor; after an emergency meeting with administrators, the administration "decided there had been no violation." (*Id.* ¶ 271). Plaintiff alleges that MS's "continued presence" in the music room throughout the school year forced her to "show up late for class" to ensure MS had left the room. (*Id.* ¶ 272).

Plaintiff alleges that she and Student Victim 2 were "forced" to ask their friends to serve as a "physical barrier" to "avoid coming face to face with [MS] in the hallway." (*Id.* ¶ 273). MS would "make loud and condescending remarks in the hallway, and conspicuously and mockingly flatten himself against the wall, drawing unnecessary attention to the situation." (*Id.* ¶ 274).

On September 26, 2017, MS violated the SAD by coming "face to face with Plaintiff" at a sign-in table for a mandatory senior class meeting, "surprising and upsetting" Plaintiff. (*Id.* ¶ 276). Plaintiff promptly reported this incident, but Defendants refused to provide a copy of the sign-in sheet or surveillance video, claiming the sign-in sheet was not preserved. (*Id.* ¶ 277).

On October 2, 2017, MS "entered English class early," before class had ended, while Plaintiff was still in the classroom. (*Id.* ¶ 280). MS stood by the doorway, "requiring Plaintiff . . . to pass in close proximity to him" on her way out. (*Id.*).

Plaintiff further alleges that in Fall 2017, Assistant Superintendent McKenna "denied Plaintiff permission to participate in jazz class in any capacity for her senior year." (*Id.* ¶ 281). Assistant Superintendent McKenna and other CSDA official also prevented Plaintiff from participating in Jazz Ensemble performance and events. (*Id.* ¶ 282). Assistant Superintendent McKenna's stated reason for these decisions was that MS was in the class. (*Id.* ¶ 283). Plaintiff alleges that the Board President arranged for MS to have "first choice of music opportunities, resulting in lost opportunities" for Plaintiff. (*Id.* ¶ 284).

Plaintiff had been assured that MS would not be performing with the school ensemble at an Albany Fund for Education Gala held on October 24, 2017. (*Id.* ¶ 288). However, MS "inserted himself among the ensemble near" Plaintiff, who became upset. (*Id.* ¶ 289). Both the Board President and Attorney Honeywell were present. (*Id.* ¶ 290). Although Plaintiff was not allowed to participate in both the Albanettes and jazz ensemble, MS performed with both the Troubadours, the male a capella group, and the jazz ensemble. (*Id.*).

Similarly, on October 30, MS was "permitted" to participate "on the same stage" as Plaintiff when a Princeton University men's choir visited the school and conducted a workshop

for music students. (*Id.* ¶ 292). MS "sang and stood on stage very close" to Plaintiff, and no adult intervened. (*Id.* ¶ 293). Plaintiff left the event early. (*Id.* ¶ 294).

On November 1, 2017, the program for a school chamber concert indicated that MS would be performing with the Jazz Ensemble. (*Id.* ¶ 297). However, MS also performed on stage with Plaintiff when he sang with the Troubadours, with whom he had not rehearsed. (*Id.*).

Plaintiff's parent expressed concern to Vice Principal Commerford about MS's violations of the SP and SAD and noted that Plaintiff was "made to feel unsafe and uncomfortable." (*Id.* ¶ 295). In response, Vice Principal Commerford stated that "feeling uncomfortable [was] not the District's concern and not part of the Safety Plan." (*Id.*). She also stated that CSDA could not deny MS his rights. (*Id.*).

Plaintiff reported a violation of the SAD on December 13, 2017, when MS participated in a choral field trip in which Plaintiff performed. (*Id.* ¶ 316). Defendants ignored the report. (*Id.* ¶ 317). On December 15, 2015, MS "came up behind" Plaintiff in a hallway, got "close" to her, and then "cut in front" of her. (*Id.* ¶ 318). Plaintiff reported the violation to security; administrators had Plaintiff fill out an incident report but "took no remedial action." (*Id.* ¶¶ 318–19).

### 3.    November 2, 2017 Board Meeting

At a Board meeting held on November 2, 2017, Mr. Kenny Bruce, a community member and former Board member, spoke during the public comment portion. (*Id.* ¶¶ 298, 142). In the days prior to the meeting, Mr. Bruce posted a message on Facebook which was "similar to the statement" he made at the Board meeting. (*Id.* ¶ 299). Although the Board President believed that at least one of Plaintiff's parents had communicated with Mr. Bruce prior to the meeting, neither Plaintiff nor her parents had any advance contact with him. (*Id.* ¶¶ 300–01). Plaintiff alleges that

Attorney Honeywell "conferred with the Board in advance of the meeting," knowing that Mr. Bruce was scheduled to speak. (*Id.* ¶ 302).

In his comments, Mr. Bruce stated that administrators "could not keep looking the other way" regarding allegations of "academic dishonesty, bullying[,] and sexual harassment." (*Id.* ¶ 298). He referenced the policy changes regarding music classes "as being related to one student with a cascading effect" to others and a related student petition seeking to undo the change. (*Id.*). Mr. Bruce further stated that students "should not be afraid of retaliation" and that students accused of harassment should not be hired as assistant coaches or lifeguards. (*Id.*). He stated that no one should receive preferential treatment based on who they know or their relatives, and asked for the Board President's resignation. (*Id.*).

Although the Board has a "stated policy" that it "generally does not respond to public comment," Attorney Honeywell "requested and received permission from the Board (specifically from the President) to speak at the conclusion" of Mr. Bruce's comments. (*Id.* ¶ 303). Attorney Honeywell stated:

> As always, it is safe to assume I have a lot more facts on this situation than you do, so I just wish to state on behalf of the Board of Education that your accusations are false, malicious and unfounded, and really should not be repeated.

(*Id.* ¶ 305). Plaintiff alleges that Attorney Honeywell knew of the accusations against MS and his positions as assistant coach and lifeguard. (*Id.* ¶ 306).

Plaintiff's parents were present at the Board meeting. (*Id.* ¶ 310). Attendees at the meeting, including Plaintiff's parents, "understood" that Honeywell's comments "referred, at least in part, to Plaintiff's complaints, and that Defendants were actively discouraging further complaints of sexual harassment." (*Id.* ¶ 311). Plaintiff alleges that at "least one other member of

18

the public" had "anticipated" speaking at the meeting on the same subject, but Attorney Honeywell's comments "achieved an intended effect of chilling further comment." (*Id.* ¶ 312).

Assistant Superintendent McKenna, who was in charge of investigating Plaintiff's complaints, was present at the Board meeting. (*Id.* ¶ 308). At this time, the investigation into MS's conduct was "ongoing." (*Id.* ¶ 309). Plaintiff therefore alleges that Attorney Honeywell's comments "inappropriately prejudged an open investigation" in the presence of Assistant Superintendent McKenna. (*Id.*).

### 4.    DASA Complaints and Plaintiff's Appeals

On October 20, 2017, Vice Principal Commerford sent a letter to MS and his family, advising them that MS's DASA complaint against Plaintiff "was not substantiated" because his allegations "did not demonstrate a DASA violation." (*Id.* ¶ 285).

In early November 2017, Assistant Superintendent McKenna denied Plaintiff's appeal of the June 2017 school-level decision on her DASA complaint against MS. (*Id.* ¶ 314). Assistant Superintendent McKenna stated that "no DASA violation had occurred," focusing on the "lone" incident of the May 2017 texts. (*Id.*). In making her decision, Assistant Superintendent McKenna accepted findings made by outside counsel. (*Id.*).

In December 2017, Plaintiff and her parents appealed Assistant Superintendent McKenna's decision to the Board. (*Id.* ¶ 315). CSDA policy "required the Board to convene a hearing in such circumstances." (*Id.*). Plaintiff and her parents sought to address Anne Savage, Vice President of the Board, and the Board in December 2017 and January 2018 "concerning the harassment, threats," and their appeal. (*Id.* ¶ 322). Contrary to Board policy, Board Vice President Savage and the Board "declined to meet with or hear Plaintiff or her parents." (*Id.*). On January 5, 2018, "in a letter signed by Board Vice President" Savage, Defendants "declined to hear the appeal" Plaintiff had filed. (*Id.* ¶ 325). The Board stated: "it is clear to us that any

determination we might render would be perceived by you as biased. For this reason, the Board has determined that it is in the best interests of you, the Board, and the District for the Board to waive any right we have" to hear the appeal. (*Id.*).

### 5.   Revocation of the SAD and SP

On or about January 18, 2018, Assistant Superintendent McKenna "unilaterally revoked the May 2017 [SAD] and September 2017 [SP]," stating that they were "null and void." (*Id.* ¶¶ 327, 329). Defendants "administratively directed" Plaintiff and MS to "remain away from each other" for the remainder of the school year. (*Id.* ¶ 330). CSDA later "revealed" that MS's parents had requested the cancelation of the SP and SAD, and it stated that Plaintiff had been using the SAD as a "weapon" against MS. (*Id.* ¶ 331).

On or about February 4, 2018, Plaintiff and her father filed an appeal with the New York State Education Department of the rescission of the SAD and SP and implementation of a "mutual" stay away directive. (*Id.* ¶ 332). On February 23, 2018, the Education Department denied Defendants' request for a "gag order" which would prohibit the dissemination of pleadings or papers connected to Plaintiff's appeal. (*Id.* ¶ 333). On February 28, 2018, the Commissioner of Education stayed the revocation of Plaintiff's SP and SAD until her appeal was decided or she graduated. (*Id.* ¶ 338). Defendants did not request a meeting with Plaintiff or her parents "to discuss implementation" of the Commissioner's order and did not meet with school administration or security. (*Id.* ¶ 339).

Plaintiff alleges additional violations of the SAD after the Commissioner's order staying its revocation. On March 12, 2018, MS entered a classroom where Plaintiff was present and refused to leave the room. (*Id.* ¶ 341). MS "positioned himself by Plaintiff's backpack," forcing her to ask a friend to retrieve it for her. (*Id.*). Plaintiff reported this incident to both Dr. Savoie and Vice Principal Commerford. (*Id.* ¶ 342). On March 14, 2018, MS came onto the auditorium

stage where Plaintiff was working on the set for an upcoming school musical. (*Id.* ¶ 344). Plaintiff left the auditorium. (*Id.*). Although witnesses reported this incident, Defendants did not take any remedial measures. (*Id.* ¶¶ 345–46).

In late April, Assistant Superintendent McKenna "initially barred Plaintiff from participating at the Founders' Day jazz concert." (*Id.* ¶ 348). Superintendent Adams reversed the prohibition "[h]ours before" the concert, and both Plaintiff and MS were allowed to perform. (*Id.*). Plaintiff also alleges that Defendants failed to enforce the SAD in late May and early June by both failing to provide Plaintiff with a "separate AP English testing location" in a different room from MS and by allowing MS to perform at a school music concert in close proximity to Plaintiff. (*Id.* ¶¶ 349, 351).

### 6.   Counseling Sessions and Treatment Letter

Throughout her senior year, Plaintiff attended "regular sessions" with Dr. Savoie on both a scheduled and unscheduled basis. (*Id.* ¶ 334). Plaintiff's counseling sessions often "took her out of regular class periods." (*Id.*). Between September 5, 2017 and February 27, 2018, Plaintiff met with Dr. Savoie 51 times. (*Id.*). Plaintiff at times arrived to meet with Dr. Savoie crying and upset over MS's conduct. (*Id.*). Dr. Savoie "communicated Plaintiff's discomfort to the school administration" and occasionally included administrators in counseling sessions to discuss incidents. (*Id.* ¶¶ 334–35).

By the time of her graduation, Plaintiff had met with Dr. Savoie for counseling on over 60 occasions. (*Id.* ¶ 364). Plaintiff desired to continue counseling after graduation and sought a continuation of treatment letter from Dr. Savoie which she could use to facilitate continuity of care. (*Id.*). Plaintiff understood that Dr. Savoie had "drafted this standard letter," but Superintendent Adams informed Plaintiff's parents that the request for a continuation letter had been submitted to CSDA's "legal team for review." (*Id.* ¶ 365). Plaintiff alleges that Defendants,

including Attorney Honeywell, "refused to provide Plaintiff with the treatment letter" despite

multiple requests, and that their refusal "did, in fact, initially inhibit Plaintiff from receiving

continuity of counseling." (*Id.* ¶ 366).

### 7.   Graduation Protest and *Times Union* Article

Prior to Plaintiff's graduation in June 2018, Superintendent Adams and Assistant

Superintendent McKenna met with Plaintiff's mother and "interrogated her about whether

Plaintiff's family was involved in planning a protest" at the graduation ceremony. (*Id.* ¶ 354).

Plaintiff's mother told the administrators that neither Plaintiff nor her family was involved in

planning any potential protest. (*Id.*). Superintendent Adams subsequently encountered Plaintiff at

school, and Plaintiff told her she was not involved in any protest. (*Id.*). At graduation rehearsals,

administrators "warned students not to engage in any action that would disrupt graduation" and

that they would be "removed from the arena" if they did. (*Id.*).

Plaintiff alleges that, by the end of the school year, many students were "angry" at

Defendants' failure to intervene and take action to protect Plaintiff and other classmates "in the

face of the conflict of interest posed by the Board President's position." (*Id.* ¶ 355). During the

graduation ceremony, "a majority of students stood up and turned their backs in protest when the

Board President delivered her graduation speech." (*Id.*). Vice Principal Commerford interrupted

the speech and ordered students to sit down or be escorted out of the arena. (*Id.*). Students

initially complied and sat down, but again stood up once the Board President resumed her

speech. (*Id.*). Plaintiff did not participate in this protest. (*Id.* ¶ 356).

The local paper, the *Times Union*, ran a story about the graduation protest on June 25,

2018. (*Id.* ¶ 357; *see also* Dkt. No. 35-5). The article indicated that the graduation protest

"related to allegations made against a student during the school year." (Dkt. No. 1, at ¶ 357).

Despite knowledge of the allegations of sexual harassment against MS, and despite having seen

the text messages involving Plaintiff, Attorney Honeywell "himself told the *Times Union*, which quoted him, that the 'allegation' was 'false, malicious and unfounded.'" (*Id.* ¶ 361).

### 8.     New York State Education Department Decision

On September 24, 2018, the Education Department issued a decision on Plaintiff's appeal of Defendants' determination that MS's conduct did not constitute bullying or harassment under DASA. (*Id.* ¶ 367; *see also* Dkt. No. 35-3). The Education Department dismissed Plaintiff's appeal, "largely on the basis of mootness" in light of Plaintiff's and MS's graduation. (Dkt. No. 1, at ¶ 367). The decision nonetheless made certain observations, including noting: "the District's failure to conduct a thorough investigation into the December 2015" texts, that CSDA's policies "did not entirely conform with DASA," and that the Board's "stated reason for refusing to hear Plaintiff's appeal was groundless." (*Id.* ¶¶ 368–70).

## III.     STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[7]

---

[7] Defendants argue that Plaintiff's Complaint violates Federal Rule of Civil Procedure 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." (Dkt. No. 35-9, at 16; Dkt. No. 43, at

## IV.    DISCUSSION

### A.    Documents to Consider in Deciding Motions to Dismiss

The District Defendants attach several documents in support of their motion to dismiss: (1) a state court complaint filed by the Board President against Plaintiff and her parents;[8] (2) a decision by the New York State Education Department in *Appeal of J.S. on behalf of his daughter, A.S.*, No. 17509 (Sept. 24, 2018); (3) a transcription of the recorded exchange between Mr. Bruce and Attorney Honeywell during the November 2, 2017 Board meeting; (4) the *Times Union* article regarding the graduation ceremony student protest; (5) District Policy Number 0115, entitled "Student Harassment and Bullying Prevention and Intervention"; (6) a text message thread between Plaintiff and MS dated November 7, 2016; and (7) a text message thread between Plaintiff and MS dated December 14, 2016. (*See* Dkt. Nos. 35-2 through 35-8). Attorney Honeywell attaches to his motion the same transcription of the exchange between Mr. Bruce and himself during the November 2, 2017 Board meeting. (Dkt. No. 42-1). Thus, as a preliminary matter the Court must decide which of these documents, if any, to consider in resolving the motions to dismiss.

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). However, considering "materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Id.* A complaint "is deemed to include any written instrument attached to it as an

---

10–11). However, violations of Rule 8 are found only in extreme circumstances not present here. *See, e.g.*, *Shomo v. New York*, 374 F. App'x 180, 183 (2d Cir. 2010) (summary order) (vacating dismissal of the plaintiff's complaint pursuant to Rule 8 where the complaint was "neither 'unintelligible' nor 'a lab[yri]nthian prolixity of unrelated and vituperative charges that defied comprehension'" (citation omitted)); *Brodsky v. First Am. Title Ins. Co. of N.Y.*, No. 17-cv-6031, 2018 WL 1710166, at *1, *4, 2018 U.S. Dist. LEXIS 60030, at *3, *9 (E.D.N.Y. Apr. 9, 2018) (dismissing the plaintiff's "lengthy" complaints totaling over 1600 pages which were "rambling, at times incoherent and nonsensical, [and] disjointed").

[8] *S.A. v. A.S., et al.*, New York State Supreme Court, New York County, Index No. 155276/2021 (filed June 1, 2021).

exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Id.* (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks omitted)). Even where a document is integral to the complaint, it must be "clear" that "no dispute exists regarding the authenticity or accuracy of the document" and that "there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner*, 463 F.3d at 134. "[I]f material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Id.* (quoting Fed. R. Civ. P. 12(d)).

The Court declines to consider the state court complaint that the Board President apparently filed against Plaintiff and her parents. (*See* Dkt. No. 35-2). The District Defendants make no argument that the state court complaint is incorporated by reference in or integral to Plaintiff's Complaint, but rather suggest that it demonstrates Plaintiff's "longstanding campaign" against and "feud" with MS and his family. (*E.g.*, Dkt. No. 35-9, at 14, 31, 36). While the Court "may take judicial notice of the fact that the state-court complaint contained certain statements," *Beauvoir v. Israel*, 794 F.3d 244, 248 n.4 (2d Cir. 2015), the Court declines to compare the substance of the Complaint's allegations with those in the state court proceeding. The Court will decide the present motions on the merits of the Complaint's allegations alone.

The Court will consider the State Education Department's decision dated September 24, 2018. (Dkt. No. 35-3). Plaintiff discusses this decision in her Complaint, quotes extensively from

it, and provides a hyperlink to the full text of the decision. (Dkt. No. 1, at ¶¶ 367–70). Thus, the Court finds that the decision is incorporated by reference in the Complaint. Further, in her opposition to Defendants' motions, Plaintiff does not challenge the authenticity of the decision filed with the District Defendants' motion to dismiss.

The Court declines to consider the transcription of the exchange between Mr. Bruce and Attorney Honeywell that occurred at the November 2, 2017 Board meeting. (*See* Dkt. Nos. 35-4, 42-1). The declaration of the District Defendants' attorney Loraine Jelinek states that the transcription was prepared by Ms. Jelinek based on her review of the "live-streamed recording of the November 2, 2017" Board meeting. (Dkt. No. 35-1, at ¶ 5). The transcription is therefore not a document integral to or incorporated by reference in the Complaint, and the Court declines to consider it.[9]

The Court will consider the *Times Union* article, (Dkt. No. 35-5), which is incorporated by reference in Plaintiff's Complaint, and the authenticity of which has not been challenged by Plaintiff. (Dkt. No. 1, at ¶¶ 357–61). The Court declines to consider District Policy Number 0115. (Dkt. No. 35-6). The Complaint references District regulations and policies, but not Policy Number 0115 specifically. (*See* Dkt. No. 1, at ¶¶ 49 (referencing "District regulations" "011.1-R, par. 12(e) [and] 0115-R"), 322 (referencing "Policy 0115.1")).

Finally, the Court declines to consider the two text message threads between Plaintiff and MS from November and December 2016. (Dkt. Nos. 35-7, 35-8). Plaintiff's Complaint appears to quote seven sentences from the seven-page November 2016 thread, (Dkt. No. 1, at ¶¶ 93–94), but even assuming this is sufficient to incorporate the November 2016 text thread by reference,

---

[9] In any event, the Court finds that there is no meaningful difference between the transcription and Plaintiff's allegations regarding the exchange for purposes of resolving the present motions. (*Compare* Dkt. No. 1, at ¶¶ 298, 305, *with* Dkt. Nos. 35-4, 42-1).

*see McLennon v. City of New York*, 171 F. Supp. 3d 69, 88–89 (E.D.N.Y. 2016) ("To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." (internal quotation marks and citation omitted)), or to "render[] the document[s] integral to the complaint," *Nicosia*, 834 F.3d at 230, Plaintiff argues that the text threads "are not capable of authentication by counsel for Defendants" and the import of the threads is at issue. (Dkt. No. 48, at 23). The District Defendants argue the two threads show that Plaintiff and MS "internally resolved" the issues between them "on their own" and "acknowledg[ed] their friendship." (Dkt. No. 35-9, at 30 n.11). However, Plaintiff disputes the relevance of the messages in light of her allegations, which must be taken as true, that she was in fact offended by MS's behavior. (Dkt. No. 48, at 23). Accordingly, there are "material disputed issues of fact regarding the relevance of the document[s]," *Faulker*, 463 F.3d at 134, and the Court declines to consider the two text threads.

### B.      District Defendants' Motion to Dismiss

Plaintiff asserts claims for retaliation under the First Amendment, violations of Title IX, violations of the Fourteenth Amendment's Equal Protection Clause, and violations of the Fourteenth Amendment's Due Process Clause against various combinations of the District Defendants. (*See* Dkt. No. 1, at ¶¶ 373–414). The District Defendants move to dismiss Plaintiff's Complaint in its entirety. (Dkt. No. 35-9).

#### 1.      First Amendment Retaliation Claims

Plaintiff asserts First Amendment retaliation claims against all Defendants. (Dkt. No. 1, at ¶¶ 395–402 (third cause of action)). The District Defendants argue that Plaintiff's retaliation claims against them must be dismissed because Plaintiff has not plausibly alleged (1) that the District Defendants took any adverse action against her due to her May 2017 report of sexual harassment or (2) a causal connection between her protected activity and any adverse action.

(Dkt. No. 35-9, at 20–28). Plaintiff responds that she has plausibly alleged multiple adverse actions as well as causal connections to her protected speech by way of both temporal proximity and retaliatory intent or motive, and that she has plausibly alleged both actual chilling of her speech as well as other harms. (Dkt. No. 48, at 39–47).

To state a First Amendment retaliation claim, a plaintiff must allege that: (1) her "speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against [her]; and (3) there was a causal connection between this adverse action and the protected speech." *Cox v. Warwick Valley Centr. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011) (citations omitted). In this context, an "adverse action" is "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Id.* at 273; *see also Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (noting that a First Amendment retaliation plaintiff must "show *either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm" and collecting cases).

### a.    Protected Conduct

The District Defendants concede for purposes of their motion to dismiss that Plaintiff's "May 24, 2017 verbal complaint to Ms. Commerford regarding MS" constitutes protected activity. (Dkt. No. 35-9, at 22). In opposition, Plaintiff argues that she was "engaged in ongoing protected activity," including seeking enforcement of the Stay Away Directive, seeking to appeal the results of her DASA complaint to the Board, requesting intervention from then-Superintendent Wilkins, and filing an action with the State Education Department. (Dkt. No. 48, at 44). The District Defendants do not respond to this assertion in their reply, (*see generally* Dkt. No. 61), and the Court therefore assumes for purposes of this decision that all of the above actions constitute protected activity.

b.       **Causation**

The Court next addresses the District Defendants' general arguments about causation that apply to all of Plaintiff's retaliation claims. To plead a causal connection between her protected speech and an adverse action, a plaintiff must plausibly allege that the protected speech was a substantial motivating factor in the adverse action. *See Dorsett*, 732 F.3d at 160; *see also Rivers v. New York City Hous. Auth.*, 176 F. Supp. 3d 229, 245–47 (E.D.N.Y. 2016) (discussing the different causation standards in the First Amendment and Title VII retaliation contexts and concluding that First Amendment claims are not governed by a but-for causal test). Causation may be shown "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of [others] who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Clayton v. City of Middletown*, 564 F. Supp. 2d 105, 112 (D. Conn. 2008) (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)); *see also Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) ("A plaintiff can establish a causal connection that suggests retaliation by showing that the protected activity was close in time to the adverse action." (citations omitted)).

The District Defendants argue that Plaintiff has not plausibly alleged a causal connection between her protected speech and any retaliatory acts by way of temporal proximity. (*See* Dkt. No. 35-9, at 27–28). In support, they argue that courts routinely hold that "the passage of two to three months" between the protected activity and the adverse action "does not allow for an inference of causation." (*Id.* at 27 (citing *Barton v. Warren County*, No. 19-cv-1061, 2020 WL 4569465, at *14, 2020 U.S. Dist. LEXIS 141128, at *39 (N.D.N.Y. Aug. 7, 2020))). Because all of Plaintiff's alleged retaliatory acts occurred more than four months after Plaintiff first complained about MS in May 2017, they argue, the alleged retaliatory acts are too remote to

draw an inference of retaliatory motivation. (*Id.* at 27–28). Plaintiff responds that (1) her burden of pleading an inference of retaliatory intent is "minimal," (2) temporal proximity is not the only method of alleging causation,[10] and (3) she engaged in "ongoing" protected activity "between May 2017 and June 2018" and therefore temporal proximity should be measured from her most recent protected activity of which the District Defendants were aware. (Dkt. No. 48, at 41–46).

It is true that "cases that accept mere temporal proximity between [a defendant's] knowledge of a protected activity and an adverse [] action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clayton*, 564 F. Supp. 2d at 112 (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). Many courts hold that the "passage of even two or three months" does not allow for an inference of causation "when no other basis to infer retaliation is alleged." *Brown v. City of New York*, 622 F. App'x 19, 20 (2d Cir. 2015) (summary order) (citations omitted). However, the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Espinal*, 558 F.3d at 129 (noting that the Court may "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases") (citation omitted).

Here, because Plaintiff has alleged that she engaged in ongoing protected activity between May 2017 and June 2018, the Court must measure temporal proximity from her "most recent protected activity" of which the District Defendants were aware. *See Cusher v. Mallick*, No. 16-cv-1273, 2020 WL 109510, at *25, 2020 U.S. Dist. LEXIS 3411, at *70–71 (Jan. 9,

---

[10] Although Plaintiff argues that she has plausibly alleged "evidence reflective of retaliatory intent," in support she merely lists the acts she alleges were retaliatory actions. (*See* Dkt. No. 48, at 42–43). Because this conflates the questions of whether Plaintiff experienced an adverse action and whether there is a causal connection to a protected activity, the Court will address the acts separately.

2020) (finding, at summary judgment stage, that there was sufficient temporal proximity to establish a causal nexus when measured from the plaintiff's most recent protected activity). Accordingly, the District Defendants' general argument that all alleged adverse actions are too temporally remote from Plaintiff's May 2017 complaint does not warrant dismissal of Plaintiff's retaliation claims.

### c. Individual Defendants

Although the parties did not brief the motion in this manner, because Section 1983 claims may only be brought against individual defendants—or a municipality pursuant to a *Monell* claim—the Court addresses the sufficiency of Plaintiff's allegations as to each Defendant separately.[11] It is well-settled that, to establish a defendant's individual liability in a suit brought under Section 1983, a plaintiff must show "the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted). A plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). In *Tangreti v. Bachmann*, the Second Circuit held that "there is no special rule for supervisory liability" and that "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).[12] Thus, the "factors" necessary to plead and establish a Section 1983 violation "'will vary with the constitutional provision at issue' because the

---

[11] Although the District Defendants make a conclusory argument that Plaintiff fails to allege the individual defendants' personal involvement for purposes of any Section 1983 claim, their argument consists primarily of reciting the Complaint's allegations involving the individual defendants. (*See* Dkt. No. 35-9, at 45–46 & n.18). Accordingly, the Court addresses the alleged retaliatory acts in the context of the District Defendants' broader arguments about Plaintiff's First Amendment retaliation claims.

[12] *Tangreti* held that the Supreme Court's *Iqbal* decision abrogated the Second Circuit's *Colon* test for showing the personal involvement of supervisory officials. *See* 983 F.3d at 618. Plaintiff's reliance on the *Colon* factors is therefore inapposite. (*See, e.g.*, Dkt. No. 48, at 60–66).

elements of different constitutional violations vary." *Id.* (quoting *Iqbal*, 556 U.S. at 676). In the context of Plaintiff's First Amendment retaliation claims, the question of the personal involvement of the individual defendants will merge with the question of whether the adverse actions Plaintiff alleges they took plausibly state a retaliation claim. As set forth below, the Court finds that Plaintiff has plausibly stated a First Amendment retaliation claim against Defendants Getto, McKenna, and Savage.[13]

### i.      Defendant Getto

Plaintiff appears to allege that Acting Principal Getto retaliated against her by, inter alia, canceling the IB History class. (*See* Dkt. No. 1, at ¶ 397(d)). The Complaint alleges that, at an April 2017 Board meeting, Acting Principal Getto indicated that "IB History HL 2 would be offered in the 2017–2018 school year." (*Id.* ¶ 261). Although the Complaint alleges that "Defendants" canceled this history class in late August 2017, construing the complaint in the light most favorable to Plaintiff, it is plausible that Acting Principal Getto was personally involved in that cancellation since she was the acting principal and had told the Board in April 2017 that the class would be offered. (*Id.* ¶¶ 262, 265). Plaintiff alleges, on information and belief, that the IB class was canceled (1) because MS would not have been allowed to enroll in the class "due to restrictions prohibiting him from taking classes" with Plaintiff and others and (2) as retaliation for her complaints. (*Id.* ¶¶ 263, 265). The District Defendants argue that the theory that school-wide acts, such as canceling an IB class, were taken in retaliation for Plaintiff's protected activity is "nonsensical [and] absurd." (Dkt. No. 35-9, at 22 n.6). Plaintiff responds that that the Complaint's allegations of school-wide acts plausibly support her First

---

[13] Because the parties' briefing does not adequately address all of the retaliatory acts Plaintiff alleges and whether or not they constitute "adverse actions" for First Amendment retaliation purposes, the Court addresses only the allegations necessary to determine whether Plaintiff's First Amendment retaliation claims survive against each individual defendant.

Amendment retaliation claims, because she has alleged retaliatory motives and evidence of pretext. (Dkt. No. 48, at 44). No party provides any supporting authority.

The Court finds that the District Defendants have not met their burden to dismiss a retaliation claim against Acting Principal Getto based on the cancelation of the IB class. The Court has not found authority to support their position that school-wide acts cannot be retaliatory. Although Plaintiff's allegation that the cancelation was "engineered" as retaliation is conclusory, she further alleges that the class was canceled because MS would not have been allowed to participate as a consequence of Plaintiff's complaints and their effects on the students' course schedules. (Dkt. No. 1, at ¶¶ 263, 265). The Complaint also alleges that the stated reason for the class cancelation was "low-enrollment," but that in fact one student was permitted to take the course, in an apparent contradiction of that stated reason. (*Id.* ¶ 262). The class cancelation in "late August" is also temporally proximate to Plaintiff's May 2017 complaint and July 27, 2017 appeal of Acting Principal Getto and Vice Principal Commerford's decision on Plaintiff's DASA complaint. (*Id.* ¶¶ 244, 265). At this early stage of the case, construing all of the allegations in the light most favorable to Plaintiff, the Court finds that she has plausibly alleged facts from which a minimal inference of retaliatory intent may be drawn. *See Espinal*, 558 F.3d at 129 ("A plaintiff can establish a causal connection that suggests retaliation by showing that the protected activity was close in time to the adverse action.").

Accordingly, the Court denies the District Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim against Acting Principal Getto.

### ii.    Defendant McKenna

Plaintiff appears to allege that Assistant Superintendent McKenna retaliated against her by, inter alia, rescinding Plaintiff's Safety Plan and Stay Away Directive. (*See* Dkt. No. 1, at ¶ 397(g)). Plaintiff alleges that Assistant Superintendent McKenna "unilaterally revoked the May

2017 Stay Away Directive and September 2017 Safety Plan" on or about January 18, 2018. (Dkt. No. 1, at ¶ 327). The revocation of Plaintiff's SAD and SP is temporally proximate to Plaintiff's December 2017 appeal to the Board of Assistant Superintendent McKenna's denial of Plaintiff's appeal of the school-level determination on her DASA complaint. (*Id.* ¶¶ 314, 315). Thus, Plaintiff has plausibly alleged facts from which a minimal inference of retaliatory intent may be drawn. *See Espinal*, 558 F.3d at 129. The District Defendants did not address this allegation, and the Court therefore finds they did not meet their burden to dismiss a retaliation claim based on the revocation. *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003) (noting that a defendant has the burden of proof on a Rule 12(b)(6) motion), *abrogation on other grounds recognized by Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016).

Accordingly, the Court denies the District Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim against Assistant Superintendent McKenna.

### iii.    Defendant Savage

Plaintiff appears to allege that Board Vice President Savage retaliated against her by, inter alia, issuing a letter of "no decision" on January 5, 2018 and refusing to consider Plaintiff's appeal. (*See* Dkt. No. 1, at ¶ 397(f), (h), (i)). The District Defendants argue that Plaintiff's claims against Board Vice President Savage are frivolous. (Dkt. No. 35-9, at 17–19). They argue that the Complaint does not allege Board Vice President Savage's personal involvement in the claim asserted against her or allege that Board Vice President Savage acted with more authority than any other Board member or CSDA voter. (*Id.*). Plaintiff responds that she has alleged Board Vice President Savage's personal involvement, and that the District Defendants do not effectively

challenge that Board Vice President Savage was acting in her capacity as a Board member and therefore a state actor. (*See* Dkt. No. 48, at 60–62).[14]

With regard to Plaintiff's allegations that Board Vice President Savage signed a letter indicating that the Board "declined to hear" Plaintiff's appeal, (*see* Dkt. No. 1, at ¶¶ 322, 325), the District Defendants appear to argue that these were actions taken by the Board, not by Board Vice President Savage individually, and therefore do not suffice to show Board Vice President Savage's personal involvement, (Dkt. No. 35-9, at 18 (citing *Downey v. Onteora Centr. Sch. Dist.*, No. 08-cv-874, 2009 WL 2259086, at *2, 2009 U.S. Dist. LEXIs 67368, at *5–6 (N.D.N.Y. July 29, 2009))). Under New York law, the "powers committed by law to the trustees of a common school district must be exercised by them as a board." N.Y. Educ. Law § 1606; *see also id.* § 2503(1) (providing that the board of education of a city school district "[s]hall perform any duty imposed upon or exercise any power granted to . . . trustees of common school districts"). However, on the present record, it is not clear that the Board's decision to decline to hear her appeal was made pursuant to "powers committed by law" to the Board. In the absence of more detailed briefing on the issue, and in light of Plaintiff's allegations that Board Vice President Savage signed a letter declining her appeal, the Court finds that the District Defendants' argument does not warrant dismissal of Plaintiff's First Amendment retaliation claims. *See Zehner v. Jordan-Elbridge Bd. of Educ.*, No. 11-cv-1202, 2019 WL 4083040, at *8, 2019 U.S. Dist. LEXIS 146950, at *24 (N.D.N.Y. Aug. 29, 2019) (finding board of education members sufficiently personally involved where there was evidence that they voted for the disciplinary charges at issue and noting that "involvement as a voting member of the board may

---

[14] In light of *Tangreti*, Plaintiff's arguments that Board Vice President Savage was personally involved by virtue of failure to supervise and deliberate indifference are not relevant to the Court's analysis. (Dkt. No. 48, at 61–62).

be sufficient personal involvement where the alleged deprivations occurred as a result of a board vote" (citation and internal quotation marks omitted)). Furthermore, because Board Vice President Savage's January 5, 2018 letter was shortly after Plaintiff's alleged protected activity in attempting to appeal the determinations on her DASA complaint, (Dkt. No. 48, at 44), the Court finds that Plaintiff has plausibly alleged a causal connection between Board Vice President Savage's acts and her protected activity by virtue of temporal proximity. (*See* Dkt. No. 1, at ¶¶ 315, 322, 325).

Accordingly, the Court denies the District Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim against Board Vice President Savage.

### 2.    Title IX Claims

Plaintiff brings Title IX claims for harassment, disparate treatment, and retaliation against the District. (Dkt. No. 1, at ¶¶ 373–84). The District Defendants argue that Plaintiff's Title IX claims must be dismissed because (1) Plaintiff has no right to make particular remedial demands and has not plausibly alleged that the District acted with deliberate indifference, (2) the May 2017 text thread does not rise to the level of "severe" or "pervasive" harassment, and (3) the District's "remedial actions successfully prevented any post-May 2017 acts of sexual harassment." (Dkt. No. 35-9, at 30–45). Plaintiff responds that (1) she plausibly alleged that the District was deliberately indifferent to MS's behavior occurring prior to May 2017, including the December 2015 texts, of which the District had actual notice by January 2017; (2) the District's deliberate indifference led to further harassment; (3) Plaintiff plausibly alleges severe or pervasive harassment; and (4) the District Defendants did not adequately address her allegations of disparate treatment. (Dkt. No. 48, at 23–38).

### a.     Harassment

Title IX provides, with certain exceptions not relevant here: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Sexual harassment is a "form of discrimination prohibited by Title IX." *Posso v. Niagara Univ.*, 518 F. Supp. 3d 688, 696 (W.D.N.Y. 2021) (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 649–50 (1999)). To state a "student-on-student sexual harassment Title IX claim," a plaintiff must allege that "(1) a federally funded educational institution (2) was deliberately indifferent to and (3) had actual knowledge of (4) sexual harassment that was so severe, pervasive, and objectively offensive that it could be said to have deprived the plaintiff of access to the educational opportunities or benefits." *Roskin-Frazee v. Columbia Univ.*, No. 17-cv-2032, 2018 WL 6523721, at *4, 2018 U.S. Dist. LEXIS 28937, at *11 (S.D.N.Y. Nov. 26, 2018) (citing *Davis*, 526 U.S. at 650); *Posso*, 518 F. Supp. 3d at 696 (same). A school has actual knowledge of harassment when a school official with "authority to address the alleged discrimination and to institute corrective measures" has actual knowledge of the discrimination. *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011). A school is deliberately indifferent to sexual harassment when its response is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648–49.

The Court finds that Plaintiff has plausibly alleged a harassment Title IX claim. First, Plaintiff has plausibly alleged that the District, as of May 24, 2017, had actual knowledge of severe and pervasive harassment. "Making a 'hostility' determination in the educational context, as in the employment context, entails examining the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with' the

victim's academic performance." *Hayut v. State Univ. of New York*, 352 F.3d 733, 745 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Here, Plaintiff has alleged that the District was aware of both the December 2015 and May 2017 texts. (Dkt. No. 1, at ¶¶ 109–11, 150).[15] On May 24, 2017, Plaintiff also told Vice Principal Commerford that MS "had for years verbally harassed her and others [and] had on at least one occasion physically grabbed her." (*Id.* at ¶ 156). Another male student told Vice Principal Commerford that the May 2017 texts were "not out of the ordinary" behavior for MS. (*Id.* ¶ 155). During late May and early June 2017, Plaintiff met with Vice Principal Commerford and "discussed multiple incidents concerning [MS] that had happened over the years," including "verbal, electronic, and physical harassment of both [Plaintiff] and other students," and the "negative impact" of those incidents. (*Id.* ¶ 205). The District also was aware of harassing conduct MS had directed at other students, which can form part of the overall hostile environment. (*E.g.*, *id.* ¶¶ 109, 153, 155, 156); *see Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 151 (2d Cir. 1997) (noting that evidence of "the harassment of women other than" the plaintiff, "if part of a pervasive or continuing pattern of conduct, was surely relevant to show the existence of a hostile environment"). Furthermore, the Complaint alleges that MS's behavior caused Plaintiff to miss class time and resulted in fewer music opportunities throughout her senior year, thereby impacting her academic environment. (*E.g.*, Dkt. No. 1, at ¶¶ 270, 272, 284, 334).

---

[15] The Court does not credit the District Defendants' argument that Plaintiff has not stated a Title IX claim because she does not allege that MS "directed any behavior towards" her in his May 2017 text with another male student. (*See* Dkt. No. 35-9, at 36–37). The District Defendants cite no authority for the proposition that conduct is per se not harassment when shared with third parties, even when the conduct references Plaintiff and it is reasonable to infer MS knew Plaintiff was likely to be made aware of it. Furthermore, the fact that notice of certain conduct came from other students, and not Plaintiff, is immaterial. *See, e.g.*, *Carabello v. New York City Dep't of Educ.*, 928 F. Supp. 2d 627, 638 (E.D.N.Y. 2013) (noting that the actual notice standard may be satisfied by "knowledge of a substantial risk of serious harm" where there have been prior complaints of the "same or similar conduct" at issue, including by other students (internal quotation marks and citation omitted)); *Zeno v. Pine Plains Centr. Sch. Dist.*, 702 F.3d 655, 668 (2d Cir. 2012) (discussing "reports of harassment" received by the school district "from many quarters").

Moreover, Plaintiff has plausibly alleged that the District was deliberately indifferent in its response to the harassment Plaintiff experienced. As stated, an educational institution is deliberately indifferent to sexual harassment when its actions are "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648–49. It is well-settled that this is not a "mere reasonableness standard." *See Doe v. Patrick*, 437 F. Supp. 3d 160, 181 (N.D.N.Y. 2020) (quoting *Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 362 (S.D.N.Y. 2017)). "Title IX does not require schools to 'remedy peer harassment' or to 'ensure that students conform their conduct to certain rules.'" *Id.* (citations omitted). Rather, deliberate indifference must, "at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *KF ex rel. CF v. Monroe Woodbury Centr. Sch. Dist.*, No. 12-cv-2200, 2013 WL 177911, at *6, 2013 U.S. Dist. LEXIS 7269, at *15–16 (S.D.N.Y. Jan. 16, 2013) (quoting *Davis*, 526 U.S. at 645). The "measures taken must be so inadequate that a degree of discriminatory intent may be inferred." *Id.* (citations omitted). Deliberate indifference is "often a fact-laden question, for which bright lines are ill-suited." *Tesoriero v. Syosset Centr. Sch. Dist.*, 382 F. Supp. 2d 387, 398 (E.D.N.Y. 2005) (citations and internal quotation marks omitted).

The District Defendants argue that the Complaint does not plausibly allege deliberate indifference because, in response to reports made on or around May 24, 2017, the District: (1) conducted an investigation into the May 2017 text messages (Dkt. No. 1, at ¶¶ 160, 170, 186, 234); (2) prepared a DASA complaint on Plaintiff's behalf (*id.* ¶ 179); (3) provided counseling services to Plaintiff, which she utilized on many occasions (*id.* ¶¶ 158, 334); (4) informed Plaintiff that a Stay Away Directive was put in place (*id.* ¶¶ 168–69); (5) engaged outside counsel in July 2017 who investigated the May 2017 texts (*id.* ¶¶ 241–42, 252); (6) provided a Safety Plan completed on September 6, 2017 (*id.* ¶ 268); and (7) arranged Plaintiff's and MS's

class schedules so they would not have classes in common (*id.* ¶ 243). However, Plaintiff has alleged numerous inadequacies in the District's response. First, the District refused to investigate any conduct other than the May 2017 texts, despite being on notice of other problematic conduct. (*See* Dkt. No. 1, at ¶¶ 160, 171). The District also allegedly discouraged students and teachers from bringing their concerns regarding MS's conduct to its attention. (*E.g.*, *id.* ¶¶ 202–04). Although Superintendent Wilkins "authorized outside counsel to investigate" MS's conduct "going back to at least December 2015" in July 2017, when she left her position a month later, "Defendants refused to honor" her promises for a broad investigation and "outside counsel was constrained to *only* investigate [MS's] May 22, 2017 texts." (*Id.* ¶¶ 241, 251–52).[16]

Second, the Complaint alleges that Plaintiff and her family were not adequately informed of their rights or any complaint procedures after her May 2017 complaint. Vice Principal Commerford did not tell Plaintiff she could file a complaint; nor did she inform Plaintiff's parents. (*See id.* ¶¶ 156–58, 185 (Vice Principal Commerford "failed to mention DASA or Title IX" and did not "inform Plaintiff's parents of any applicable complaint procedures")). Plaintiff and her family did "their own research" to "uncover[] that they could make a DASA complaint." (*Id.* ¶ 227). Allegations of a failure to inform a victim of harassment of her rights or complaint procedures can support an inference of an unreasonable response. *See, e.g.*, *Doe v. Sarah Lawrence Coll.*, 453 F. Supp. 3d 653, 666 (S.D.N.Y. 2020) (finding the plaintiff had sufficiently alleged the defendant's deliberate indifference where their "meeting proceeded in a rushed, disorganized and undocumented manner, and the plaintiff was allegedly never fully explained her rights and options").

---

[16] The State Education Department would later remind the District that it must conduct a "thorough investigation" into any allegation of harassment. (*See* Dkt. No. 1, at ¶ 368; Dkt. No. 35-3, at 9).

Finally, although a Stay Away Directive was ostensibly put in place to keep MS away from Plaintiff, the Complaint alleges that the District failed to make teachers and other school personnel aware of the SAD, thereby thwarting its effectiveness. (*See, e.g.*, Dkt. No. 1, at ¶¶ 168, 173–76). In June 2017, Plaintiff had to alert her history teacher to the existence of the SAD, and her mother would later request a meeting with Plaintiff's teachers to ensure they all knew of the SAD. (*Id.* ¶¶ 217–21). Although "Defendants finally completed and signed a Safety Plan" in September 2017, they also instructed Plaintiff and her family "not to share it with anyone." (*Id.* ¶ 268). Assistant Superintendent McKenna "told Plaintiff's parents that if [the SP] became public, the District and Board would know who 'leaked it.'" (*Id.*). During Plaintiff's senior year, the District again "repeatedly refused to share either the [SAD] or [SP] with teachers, including music teachers and security." (*Id.* ¶ 269). The SAD and SP were "unilaterally revoked" in January 2018; the State Education Department would stay this revocation on February 28, 2018. (*Id.* ¶¶ 327, 338). The Complaint further alleges that, throughout this time period, the District allowed repeated violations of the SAD. (*E.g.*, *id.* ¶¶ 193, 196, 209–10, 217, 266, 270, 276, 280, 288–90, 316, 318, 341).

Taking these allegations together, the Court cannot deem the District's response as "not clearly unreasonable as a matter of law." *See Davis*, 526 U.S. at 649.[17] "Responses that are not reasonably calculated to end harassment are inadequate." *Zeno*, 702 F.3d at 669 (citing *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000) ("Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same

---

[17] The Court does not rely on Plaintiff's allegations that MS was not sufficiently disciplined, which are insufficient to plausibly allege the District's deliberate indifference. *See KF ex rel. CF v. Monroe Woodbury Centr. Sch. Dist.*, 531 F. App'x 132, 134 (2d Cir. 2013) (summary order) ("[A] court must accord sufficient deference to the decisions of school disciplinarians." (citation omitted)); *cf. Oliveras v. Saranac Lake Centr. Sch. Dist.*, No. 11-1110, 2014 WL 1311811, at *19, 2014 U.S. Dist. LEXIS 44603, at *57–58 (N.D.N.Y. Mar. 31, 2014) (rejecting, in the Title VI context, the plaintiffs' argument that "the involved individuals should have been more severely disciplined").

methods to no avail, such district has failed to act reasonably in light of the known circumstances.")). In *Zeno*, for example, the Second Circuit affirmed a jury's finding of deliberate indifference, noting that the jury reasonably could have found that the school district's remedial measures "were little more than half-hearted measures." *Id.* at 670 (noting that the training programs were, inter alia, optional). Further, the jury could have found that the district "ignored the many signals that greater, more directed action was needed." *Id.* at 671 (noting that the school officer charged with investigating complaints knew that the plaintiff was being harassed but "elected not to investigate"). Here, the Complaint similarly alleges that the District unreasonably constrained its investigation to only the May 2017 texts and not any other conduct of which it was aware. The Complaint also plausibly alleges that the SAD and SP were only "half-hearted measures," given the District's failure to notify teachers and school staff of their existence and the failure to prevent repeated violations. *Cf. Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 447–48 (D. Conn. 2006) (denying summary judgment on the issue of deliberate indifference where the school "allowed [the assailant] to remain in school exposing [the plaintiff] to the potential for emotional encounters and harassment," "especially in the conflicted context of the assailant's father serving as a member of the Board," and where "the Board made no other efforts to reduce [the plaintiff's] vulnerability to traumatic interactions with her attacker or to otherwise reach out to her to offer protection").

Accordingly, the Court denies the District Defendants' motion to dismiss Plaintiff's Title IX harassment claim.

### b.      Disparate Treatment

The District Defendants' only reference to Plaintiff's disparate treatment Title IX claim is to assert, in a footnote, that the claim is "legally infirm" because Plaintiff's allegation that she was denied participation in the canceled IB class does not allege that the gender of the one

student who was allowed to take the class. (Dkt. No. 35-9, at 44 n.16). However, the District

Defendants do not address Plaintiff's allegations underlying her disparate treatment claims,

including that the District treated MS more favorably than her. (Dkt. No. 1, at ¶¶ 380–81, 389–

90; *see also* Dkt. No. 48, at 36–37). Because the District Defendants' briefing on the issue is

inadequate, the Court denies their motion to dismiss Plaintiff's Title IX disparate treatment claim

without prejudice. *See Longsworth v. County of Nassau*, No. 17-cv-6787, 2019 WL 8587289, at

*6, 2019 U.S. Dist. LEXIS 230495, at *15–16 (E.D.N.Y. July 16, 2019) (denying motion to

dismiss due to the parties' inadequate briefing).

### c.    Retaliation

To state a prima facie Title IX retaliation claim, a plaintiff must allege: "(1) protected

activity; (2) knowledge by the defendant of the protected activity; (3) adverse school-related

action; and (4) a causal connection between the protected activity and the adverse reaction."

*Novio v. N.Y. Academy of Art*, 286 F. Supp. 3d 566, 577 (S.D.N.Y. 2017) (citations omitted). At

the pleading stage, a plaintiff need only allege facts which "give plausible support to a 'minimal

inference' of discriminatory motivation." *Id.* at 578. The District Defendants argue that

Plaintiff's "redundant" Title IX retaliation claim fails for the "same reasons" that her First

Amendment retaliation claims fail. (Dkt. No. 35-9, at 44 n.16). In response, Plaintiff also points

to her First Amendment retaliation claim arguments. (*See* Dkt. No. 48, at 37–38).

The Court finds that Plaintiff has plausibly alleged a Title IX retaliation claim against the

District. As discussed above, Plaintiff has alleged that she engaged in protected activity, school

officials were aware of that activity, and a causal connection with at least one alleged school-

related adverse action: Assistant Superintendent McKenna's January 2018 revocation of the

SAD and SP. *See supra* Section IV.B.1. Because Plaintiff has "satisfied the 'exceedingly low

burden of demonstrating a plausible minimal inference' of retaliation," *Novio*, 286 F. Supp. 3d at 579, her Title IX retaliation claim may proceed.

### 3.    Equal Protection Claims

Plaintiff asserts Equal Protection claims for harassment and disparate treatment against all District Defendants. (Dkt. No. 1, at ¶¶ 385–94). The District Defendants argue that Plaintiff's Equal Protection claims must be dismissed largely for the same reasons they advance in support of dismissal of her Title IX claims. (*See generally* Dkt. No. 35-9, at 30–45). To state an Equal Protection harassment claim, a plaintiff must plead that (1) she was harassed by others based on a protected characteristic, such as sex, (2) the harassment was "actually known" to the defendant school official, and (3) the defendant's "response to such harassment was so 'clearly unreasonable in light of the known circumstances' as to give rise to a reasonable inference that the defendant himself intended for the harassment to occur." *DiStiso v. Cook*, 691 F.3d 226, 240–41 (2d Cir. 2012) (citations omitted); *see also Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 140–41 (2d Cir. 1999) (noting that, as with Title IX claims, a plaintiff asserting an Equal Protection harassment claim against school officials must allege their deliberate indifference to student-on-student harassment). The "ultimate inquiry" is "one of discriminatory purpose on the part of the defendant himself." *Id.* at 141. The Court determined above that the Complaint plausibly alleges that the District was deliberately indifferent to reports of MS's alleged harassment of Plaintiff. *Supra* Section IV.B.2.a. Accordingly, Plaintiff's Equal Protection harassment claim may proceed.[18]

---

[18] The parties did not brief the issue of whether individual defendants Getto, McKenna, and Savage were each deliberately indifferent; the Court therefore does not analyze the issue in the first instance.

As with Plaintiff's Title IX claims, the District Defendants do not meaningfully address Plaintiff's disparate treatment claims brought under the Equal Protection Clause. (*See* Dkt. No. 35-9, at 44 n.16 (referencing only the allegation regarding offering the IB class to one student but denying participation to Plaintiff)). The Court therefore denies the District Defendants' motion to dismiss Plaintiff's Equal Protection disparate treatment claims without prejudice.

### 4.      Due Process Claims

Plaintiff brings claims for denial of her procedural due process rights under the Fourteenth Amendment against all District Defendants. (Dkt. No. 1, at ¶¶ 403–14). Plaintiff's due process claim is based on her allegations that the District Defendants never provided a written account of the allegations against her contained in MS's DASA complaint, the complaint itself, or a written investigation report or resolution, contrary to Board policy. (*Id.*; *see also id.* ¶¶ 231–32, 237–39). The District Defendants argue that Plaintiff's due process claims should be dismissed because (1) she does not have a protected liberty or property interest in receiving a copy of MS's DASA complaint or the related investigative report, (2) process was available to her in the form of an administrative appeal to the State Education Department, and (3) she failed to commence an Article 78 proceeding under New York law to compel production of the documents. (Dkt. No. 35-9, at 29–30). Plaintiff responds that she has protected interests in her "right to a public education" and the right to a written explanation of the outcome of the complaint against her under Board policy, and that she did not receive the process due her under that policy. (Dkt. No. 48, at 54–56).

To state a claim under Section 1983 for the denial of procedural due process, a plaintiff must allege both the existence of a protected property or liberty interest, and that he or she was deprived of that interest without being afforded sufficient process. *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012). The Court finds that Plaintiff has not plausibly

45

alleged a procedural due process claim because she has not identified a protected interest of which she was actually deprived by virtue of the District Defendants' challenged conduct. It is true that "the property right granted to Plaintiff as a public school student under New York law is a sufficient interest for a procedural Due Process claim." *D.C. v. Copiague Union Free Sch. Dist.*, 16-cv-4546, 2017 WL 3017189, at *8, 2017 U.S. Dist. LEXIS 113253, at *26 (E.D.N.Y. July 11, 2017). However, a student's procedural due process rights are triggered only when the student is excluded from the "entire educational process." *Id.*, 2017 WL 3017189, at *9, 2017 U.S. Dist. LEXIS 113253, at *27. Here, Plaintiff has not alleged that MS's DASA complaint or the District Defendants' failure to inform her, in writing, of the allegations against her and their ultimate resolution deprived her of her right to a public education, whether by discipline, suspension, expulsion, or similar action. The cases she cites are therefore inapposite. *See, e.g.*, *C.T. v. Valley Stream Union Free Sch. Dist.*, 201 F. Supp. 3d 307, 318 (E.D.N.Y. 2016) (finding that the student's multiple suspensions from school "constitute[d] a deprivation" of his right to a public education); *Takeall ex rel. Rubinstein v. Ambach*, 609 F. Supp. 81, 85–86 (S.D.N.Y. 1985) (analyzing the plaintiff's procedural due process claim where the district determined he was ineligible to enroll in school, thereby depriving him of his right to a public education).

Moreover, Plaintiff conflates the elements of a procedural due process claim and claims a protected interest in the very process she asserts she was due under "Board policy"—i.e., being informed in writing of the allegations against her and their resolution. As the Supreme Court has stated: "Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983); *see also Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003) (noting that "[e]levating a state-mandated procedure to the status of a constitutionally protected liberty or

property interest" would impermissibly "make process an end in itself" (citations omitted)).

Without alleging she was deprived of a "substantive interest" as a result of MS's DASA

complaint, therefore, Plaintiff has no viable due process claim.

Accordingly, the Court grants the District Defendants' motion to dismiss Plaintiff's due

process claims.[19]

### 5.    Qualified Immunity

The District Defendants argue that individual defendants Acting Principal Getto,

Assistant Superintendent McKenna, and Board Vice President Savage are entitled to qualified

immunity on all of Plaintiff's Section 1983 claims against them. (Dkt. No. 35-9, at 46–48).

However, after reciting the law on qualified immunity, their argument consists of a single

sentence: "When analyzing the alleged 'state actions' that the individual Movants are purported

to have been personally involved in, it is clear that none of those actions violated clearly

established law and, therefore, McKenna, Getto, and Savage are entitled to immunity from suit."

(*Id.* at 48).

Qualified immunity is an affirmative defense on which defendants bear the burden of

proof. *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013). For a qualified immunity defense

asserted in a motion to dismiss to be successful, the "facts supporting the defense [must] appear

on the face of the complaint," and the plaintiff "is entitled to all reasonable inferences from the

facts alleged . . . that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 434, 436

(2d Cir. 2004) (describing a defendant's burden of establishing a qualified immunity defense in a

Rule 12(b)(6) motion as a "formidable hurdle"); *see also Ziemba v. Lynch*, No. 11-cv-974, 2013

---

[19] In light of this holding, the Court need not address arguments regarding due process claims against individual defendants specifically or a *Monell* claim against the District.

WL 5232543, at *9, 2013 U.S. Dist. LEXIS 132540, at *24 (D. Conn. Sept. 17, 2013) (denying

motion to dismiss on qualified immunity grounds where the defendant "only include[d] the legal

standard for establishing qualified immunity and, in a conclusory manner, state[d] that the claims

. . . are subject to dismissal based on [that] law"). The District Defendants' conclusory, one-

sentence argument fails to demonstrate how they are entitled to qualified immunity at the

pleadings stage.

Accordingly, the Court denies the District Defendants' motion to dismiss on qualified

immunity grounds without prejudice to raising the defense at a later time.

### 6.    *Monell* Claims Against the District

The District Defendants move for dismissal of Plaintiff's 42 U.S.C. § 1983 claims against

the District on the ground that Plaintiff fails to state a claim of municipal liability under *Monell*

*v. Department of Social Services*, 436 U.S. 658 (1978). A municipality "may not be sued under

§ 1983 for an injury inflicted solely by its employees or agents," and is liable only when it

actually deprives, through the execution of its policies, an individual of his constitutional rights.

*Monell*, 436 U.S. at 694. "To establish liability under *Monell*, a plaintiff must show that he

suffered the denial of a constitutional right that was caused by an official municipal policy or

custom." *Bellamy v. City of New York*, 914 F.3d 727, 756 (2d Cir. 2019). A municipal policy or

custom may be established where the facts show: (1) a formal policy, officially promulgated by

the municipality, *Monell*, 436 U.S. at 690; (2) action taken by the official responsible for

establishing policy with respect to a particular issue, *Pembaur v. Cincinnati*, 475 U.S. 469, 483–

84 (1986); (3) unlawful practices by subordinate officials so permanent and widespread as to

practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–30 (1988); or

(4) a failure to train or supervise that amounts to "deliberate indifference" to the rights of those

with whom the municipality's employees interact, *City of Canton v. Harris*, 489 U.S. 378, 388

(1989); *see Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). To prevail on a municipal liability claim, a plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) (quoting *City of Canton*, 489 U.S. at 385).

The District Defendants argue that Plaintiff has not "describe[ed], or even identif[ied], any specific policy, practice, or custom of the [District] which caused an alleged violation of any of Plaintiff's constitutional rights." (Dkt. No. 35-9, at 48–49). Plaintiff responds that there are many ways a plaintiff may allege a policy, custom, or practice, including a failure to train, which the District Defendants did not adequately address. (Dkt. No. 48, at 56–59). In light of the Court's holdings above, the Court need only determine whether Plaintiff has stated a *Monell* claim against the District with regard to her surviving Section 1983 claims.

Plaintiff's Complaint alleges, inter alia, that:

> Defendants CSDA and BOE deprived A.S. of her rights by virtue of an official policy or custom that caused her Constitutional injuries [by] failing to adequately train School District staff about policies prohibiting harassment, discrimination, and retaliation on the basis of sex, and/or failing to adequately supervise School District staff, including but not limited to Jodi Commerford and/or Academy Principal Suzann Cornell in carrying out their duties, and/or failing to adequately train School District staff as to the manner in which to investigate complaints of harassment/discrimination/retaliation on the basis of sex.

(Dkt. No. 1, at ¶ 387).[20] Here, Plaintiff has plausibly alleged a *Monell* claim against the District based on a failure to train. Plaintiff alleges that the District failed to train staff about its

---

[20] Plaintiff does not allege the existence of a formal policy. Nor does she allege that any of the challenged conduct was taken by a "final policymaker." *See Jeffes v. Barnes*, 208 F.3d 49, 57–58 (2d Cir. 2000) (holding that the question of whether an official is a final policymaker under state law is a question of law on which the plaintiff bears the burden of proof); *see also Lockwood v. Town of Hempstead*, No. 16-cv-3756, 2017 WL 9485687, at *11, 2017 U.S. Dist. LEXIS 27339, at *31–32 (E.D.N.Y. Feb. 24, 2017) (dismissing *Monell* claim where the plaintiff's complaint "contains no explicit reference to an[y] individuals with final policymaking authority, no such individuals' authority is

harassment, discrimination, and retaliation policies and failed to train staff in investigating

complaints of discrimination and retaliation. (*Id.*). Thus, the question is whether the facts alleged

permit an inference that this failure to train amounts to deliberate indifference. To support a

claim that a municipality's failure to train amounts to deliberate indifference, Plaintiff must

show:

> (1) that a policymaker of the municipality knows to a moral certainty
> that its employees will confront a given situation; (2) that the
> situation either presents the employee with a difficult choice of the
> sort that training or supervision will make less difficult or that there
> is a history of employees mishandling the situation; and (3) that the
> wrong choice by the employee will frequently cause the deprivation
> of a citizen's constitutional rights.

*Young v. County of Fulton*, 160 F.3d 899, 903–04 (2d Cir. 1998) (citing *Walker v. City of New*

*York*, 974 F.2d 293, 297–98 (2d Cir. 1992) (internal quotations and alterations omitted)). From

the facts alleged in the Complaint, it can be inferred that District policymakers knew school

officials would confront complaints of discrimination and retaliation which it would need to

investigate and resolve, that training would assist school officials in recognizing and resolving

such situations, that improper investigations or handling could violate students' Equal Protection

or First Amendment rights, and that the District failed to adequately train its employees, like

Vice Principal Commerford, who was unfamiliar with how to handle or investigate Plaintiff's

complaints of harassment. (*See* Dkt. No. 1, at ¶¶ 188–89 (alleging that it is "unknown" whether

Vice Principal Commerford had "any training on best practices for thoroughly investigating

potential violations of DASA/Title IX"), 187 ("I'm not used to dealing with this sort of

problem."), 190 (alleging that Vice Principal Commerford stated she was "feeling

---

described, and no allegation is made regarding whether one or more individuals exercised the required 'final
policymaking authority' in causing plaintiff's alleged injury").

uncomfortable" when speaking with Plaintiff's mother)).Thus, it plausible to infer that the failure to train amounts to deliberate indifference.

Accordingly, Plaintiff's First Amendment and Equal Protection *Monell* claims against the District may proceed.

### 7.      Injunctive Relief

Finally, the District Defendants argue that Plaintiff lacks standing to pursue injunctive relief because she graduated from high school in June 2018 and therefore faces no risk of future injury from the challenged conduct. (Dkt. No. 35-9, at 19–20). Although the District Defendants move to dismiss "all claims for injunctive relief," they only refer with any specificity to "allegations directed at [District] policies/regulations," (*Id.*). Plaintiff responds that the District Defendants did not adequately "differentiate between" the types of injunctive relief she seeks and that the Court has the authority to order prospective relief under Title IX. (Dkt. No. 48, at 69–70).

To the extent that the District Defendants argue that Plaintiff, because of her graduation, cannot pursue injunctive relief requiring policy changes from the District under Title IX or Section 1983, the Court agrees. In *Cook v. Colgate University*, the Second Circuit held that the plaintiffs' Title IX claim against the university was moot because "[n]one of the plaintiffs [could] benefit" from the injunctive relief sought. 992 F.2d 17, 19 (2d Cir. 1993); *see id.* ("Because [plaintiffs] will have graduated by [the time the injunctive relief would take effect], nothing that we decide could affect their rights vis-a-vis Colgate."); *see also B.C. v. Mount Vernon Sch. Dist.*, 660 F. App'x 93, 96 (2d Cir. 2016) (summary order) (holding that the plaintiffs' claims for equitable relief against the school under Section 1983 were "moot" in light of their graduation) (citing *Fox v. Bd. of Trustees of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994)). Similarly, Plaintiff has long graduated from high school and cannot benefit from any

changes to District policies; nor would such an order affect her rights vis-a-vis the District. *Cf.*

*Cook*, 992 F.2d at 19. Thus, to the extent Plaintiff's Complaint seeks injunctive relief changing

District policies/regulations, those claims are dismissed because she lacks standing to pursue

such relief.[21]

### C.      Defendant Honeywell's Motion to Dismiss

Plaintiff asserts a First Amendment retaliation claim against Attorney Honeywell in his

individual capacity. (*See* Dkt. No. 1, at ¶¶ 395–402 (third cause of action)). Plaintiff alleges three

retaliatory actions attributable to Honeywell: "implicitly threatening to sue" Plaintiff if she were

to continue complaining about sexual harassment at the November 2, 2017 Board meeting;

implicitly threatening to sue Plaintiff in a statement made to the *Times Union*; and refusing to

provide a continuation of treatment letter upon Plaintiff's graduation. (*Id.* ¶ 397(f), (m), (n)).

Attorney Honeywell moves to dismiss the claim against him, generally arguing that (1) he is not

a state actor and therefore cannot be held liable under Section 1983, (2) Plaintiff has not

plausibly pled all of the elements of a First Amendment retaliation claim, and (3) he is protected

by qualified immunity. (*See generally* Dkt. No. 43).[22]

### 1.      Conduct at Issue

As an initial matter, the Court must determine what conduct underpins Plaintiff's

retaliation claim against Attorney Honeywell. Attorney Honeywell argues that the "only

allegations relevant to [the claim against him] are those which purportedly took place on

November 2, 2017." (Dkt. No. 43, at 17–20; *see also* Dkt. No. 62, at 7–8). In her opposition,

---

[21] The District Defendants' motion to dismiss Plaintiff's requests for *all* injunctive relief is denied because they have not adequately addressed all of the various other forms of injunctive relief Plaintiff seeks. (*See, e.g.*, Dkt. No. 1, at 80–81 (seeking declaratory relief, a public apology, and retraction of statements)).

[22] The Court does not address Attorney Honeywell's arguments regarding any defamation or "stigma plus" claim, (Dkt. No. 43, at 26–29; Dkt. No. 62, at 22–23), as Plaintiff's Complaint asserts no such claim.

Plaintiff contends that Attorney Honeywell "ignores the other retaliatory conduct which Plaintiff alleges he engaged in." (Dkt. No. 48, at 39; *see also id.* at 40 n.15 (arguing she has "adequately alleged harm stemming from Defendant Honeywell's comments both at the Board Meeting and to the Times Union, as well as from the denial of treatment letter"), 46 (arguing Attorney Honeywell failed to make any causation argument with respect to the treatment letter or statement to the *Times Union*)).

The Court will consider Attorney Honeywell's statement to the *Times Union* and the denial of the treatment letter as potential bases for Plaintiff's retaliation claim against him, in addition to his statements at the November 2, 2017 Board meeting. Attorney Honeywell's arguments that these allegations are irrelevant rest on an incorrect or narrow reading of the Complaint or inappropriately dispute the veracity of Plaintiff's allegations. With regard to the *Times Union* article, Attorney Honeywell argues that the Complaint "does not reflect" an allegation that he spoke with the newspaper and asserts that the newspaper only "quoted" his statement from the Board meeting. (Dkt. No. 62, at 6–7; *see also* Dkt. No. 43, at 18–19). However, the Complaint plainly alleges, and the Court therefore accepts as true, that Attorney Honeywell "himself *told* the *Times Union*, which quoted him, that the 'allegation' was 'false, malicious and unfounded.'" (Dkt. No. 1, at ¶ 361 (emphasis added)).[23] With respect to the treatment letter, Plaintiff alleges that her request was "submitted to [the District's] legal team for review" and that "Defendants, including District Counsel Honeywell, refused to provide" such a letter, despite multiple requests. (*Id.* ¶¶ 365–66). Attorney Honeywell's argument that Plaintiff did not allege his involvement is therefore incorrect: not only did she specifically link him to the

---

[23] Attorney Honeywell's assertion that the Complaint merely alleges that the newspaper "invoked the heft" of his statement, (Dkt. No. 62, at 7), is also incorrect. The allegation to which Attorney Honeywell refers accuses the Board President, not the *Times Union*, of "invoking the heft of the School District Counsel, Jeffrey Honeywell, to lend weight to the baseless threats." (Dkt. No. 1, at ¶ 359).

decision not to provide a treatment letter, but it is a reasonable inference to draw in Plaintiff's favor that Attorney Honeywell, the District's retained counsel, was part of its "legal team." Accordingly, the Court rejects Attorney Honeywell's argument that the only conduct relevant to the claim against him relates to the Board meeting.

### 2.      State Action

Attorney Honeywell argues that he cannot be liable under Section 1983 because his position as the District's privately retained attorney does not convert him into a state actor, and his actions at the November 2, 2017 Board meeting are not otherwise state action. (Dkt. No. 43, at 11–13). Plaintiff responds that Attorney Honeywell may be liable under Section 1983 because he engaged in "joint action" with the District and his conduct was a "public function." (Dkt. No. 48, at 48–54).

It is well-settled that a plaintiff alleging a violation of her constitutional rights under Section 1983 must show state action. *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012); *see also* 42 U.S.C. § 1983 (imposing liability on persons who act "under color of any [state] statute, ordinance, regulation, custom, or usage"). While private parties generally are not state actors, their conduct can be attributed to the state for Section 1983 purposes if "(1) the State compelled the conduct [the "compulsion test"], (2) there is a sufficiently close nexus between the State and the private conduct [the "joint action test" or "close nexus test"], or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the state [the "public function test"]." *Hogan v. A.O. Fox Mem'l Hosp.*, 346 F. App'x 627, 629 (2d Cir. 2009) (summary order) (citing *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)). The "fundamental question" for each test is whether the private party's conduct is "fairly attributable" to the state such that it bears responsibility. *Fabrikant*, 691 F.3d at 207.

Attorney Honeywell is a private attorney who was retained to represent the District. (*E.g.*,

Dkt. No. 1, at ¶¶ 31, 178). As Plaintiff concedes, the mere fact that Attorney Honeywell

represented a public entity does not convert him into a state actor who may be held liable under

Section 1983. *Shaw v. Rondout Valley Centr. Sch. Dist.*, No. 15-cv-215, 2015 WL 8492487, at

\*7, 2015 U.S. Dist. LEXIS 165415, at \*20–21 (N.D.N.Y. Dec. 10, 2015) ("Defendant Lambert's

position as an attorney in private practice who was retained by the School District does not make

him a state actor for purposes of section 1983." (collecting cases)); *see also Watson v. Grady*,

No. 09-cv-3055, 2010 WL 3835047, at \*8, 2010 U.S. Dist. LEXIS 103473, at \*26–27 (S.D.N.Y.

Sept. 30, 2010) (noting that defendant could not be held liable under Section 1983 as a state actor

"simply because she was hired as a private attorney" for the school district). Thus, for Attorney

Honeywell's conduct to be state action, it would have to satisfy one of the three tests making his

actions "fairly attributable" to the state.

At this stage, the Court finds that Plaintiff has plausibly alleged that Attorney Honeywell

engaged in joint action with the District at the November 2017 Board meeting and therefore that

his actions may constitute state action for purposes of Section 1983.[24] To act under color of state

law, "it is enough that the private party is a willful participant in joint action with the State or its

agents." *Forbes v. City of New York*, No. 05-cv-7331, 2008 WL 3539936, at \*5, 2008 U.S. Dist.

LEXIS 63021, at \*12 (S.D.N.Y. Aug. 12, 2008) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27

(1980)) (brackets omitted). The "touchstone of joint action is often a 'plan, prearrangement,

---

[24] The Court disagrees with Plaintiff's argument that Attorney Honeywell engaged in a public function. (*See* Dkt. No. 48, at 52). The public function test focuses on "whether the activity historically has been an exclusive prerogative of the sovereign," and the test is narrowly construed. *See Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264–65 (2d Cir. 2014) ("While many functions have been traditionally performed by governments, very few have been exclusively reserved to the State.") (citations omitted). The Board's exercise of its "authority to speak," which Plaintiff argues was delegated to Attorney Honeywell, (Dkt. No. 48, at 52), is not a function exclusively reserved to the State.

conspiracy, custom, or policy'" shared by the private actor and the State. *Id.*, 2008 WL 3539936, at *5, 2008 U.S. Dist. LEXIS 63021, at *13. Here, the Complaint alleges that Mr. Bruce posted a message on Facebook in the days leading up to the Board meeting and that Attorney Honeywell "conferred with the Board in advance of the meeting, knowing that [Mr. Bruce] was scheduled to speak during the public comment portion of the meeting." (Dkt. No. 1, at ¶¶ 299, 302). The Complaint further alleges that Attorney Honeywell "requested and received permission from the Board (specifically from the President)" to speak after Mr. Bruce in response to his statement. (*Id.* at ¶ 303). These allegations plausibly allege that Attorney Honeywell engaged in joint action with the Board and District by coming to an "agreement" about responding to Mr. Bruce at the meeting. *Cf. Mercer v. Schriro*, 337 F. Supp. 3d 109, 147–48 (D. Conn. 2018) (finding the plaintiff had plausibly alleged that "there was an agreement" between private parties and state by virtue of "concerted and overt acts," including a closed-door meeting). The Court will therefore consider the merits of Plaintiff's First Amendment retaliation claim based on Attorney Honeywell's comments at the Board meeting.

However, the Court finds that Plaintiff has not plausibly alleged that any involvement Attorney Honeywell had in not providing Plaintiff with a continuation of treatment letter constitutes state action under one of the three tests. (*See* Dkt. No. 1, at ¶¶ 365–66). The Complaint alleges that Superintendent Adams told Plaintiff's parents that the request for the treatment letter had "been submitted to our legal team for review," and that Attorney Honeywell "refused to provide Plaintiff with the treatment letter." (*Id.*). The Complaint does not plausibly allege that Attorney Honeywell engaged in "joint action" by way of "plan, prearrangement, conspiracy, custom, or policy" shared by the private actor and the State. *Forbes*, 2008 WL 3539936, at *5, 2008 U.S. Dist. LEXIS 63021, at *13. Nor does the Complaint allege that a

decision to provide a continuation of treatment letter is a public function. Accordingly, because she has not alleged state action, Plaintiff may not bring a Section 1983 claim against Attorney Honeywell with respect to the denial of the continuation of treatment letter.

### 3.    Board Meeting Comments

Attorney Honeywell argues that Plaintiff's First Amendment retaliation claim against him must be dismissed because Plaintiff failed to plausibly plead that (1) she engaged in protected conduct "relative to" Attorney Honeywell; (2) Attorney Honeywell's actions were motivated by any protected conduct; and (3) Attorney Honeywell's actions effectively chilled the exercise of her First Amendment rights. (Dkt. No. 43, at 20–25). Plaintiff responds that (1) she need only plead that Attorney Honeywell was aware of her protected activity, not that it was directed specifically at him; (2) Attorney Honeywell's causation argument improperly makes factual arguments about the motivation and import of his words; and (3) she has alleged both actual chilling of her speech and other concrete harm. (*See* Dkt. No. 48, at 39–40, 46–47).

With regard to the first element, the Court agrees with Plaintiff that Attorney Honeywell conflates the question of whether Plaintiff engaged in any protected activity at all with the question of whether there is a causal connection between that activity and Honeywell's comments. (*See id.* at 39). Attorney Honeywell cites no authority for the proposition that Plaintiff must have directed her protected conduct at him specifically. (*See* Dkt. No. 43, at 21). Indeed, the inquiry is whether a defendant is aware of the protected activity. *See, e.g.*, *Pavone v. Puglisi*, 353 F. App'x 622, 625 (2d Cir. 2009) (summary order) (noting that a plaintiff must "allege that defendants were aware of the protected activity"); *Espinal*, 558 F.3d at 129–30 (discussing whether the defendant was "aware of" or had "learned of" the plaintiff's protected activity). Here, Plaintiff has plausibly alleged that she engaged in protected activity of which Attorney Honeywell was aware. (*See* Dkt. No. 1, at ¶¶ 162 (Attorney Honeywell was "informed

about the texts and spoke with Commerford"), 235 (attorney from Attorney Honeywell's firm attended meeting with Plaintiff's parents and school officials and discussed May 2017 and December 2015 texts), 251 (Attorney Honeywell informed departing Superintendent Wilkins that the investigation into MS's conduct "was no longer her concern")). Plaintiff has therefore plausibly alleged the first element of a retaliation claim. With respect to a plausible causal connection, the Court notes that Plaintiff's appeal of her DASA report to Assistant Superintendent McKenna was pending at the time of the November 2, 2017 Board meeting. (*Id.* ¶ 314).

The Court takes as true Plaintiff's allegations that Mr. Bruce and Attorney Honeywell's exchange was reasonably understood to refer at least in part to Plaintiff, and that it was perceived as threatening or intending to chill further speech. (*See id.* ¶¶ 311 (alleging that meeting attendees understood that Attorney Honeywell's "comments referred, at least in part, to Plaintiff's complaints, and that Defendants were actively discouraging further complaints"), 312 (alleging that an attendee had planned to participate in the public comment time but, after hearing Attorney Honeywell's comments, did not)). However, the Court concludes that Plaintiff has not stated a First Amendment retaliation claim against Attorney Honeywell for his comments at the Board meeting because she has not plausibly alleged an adverse action. The First Amendment prohibits state actors "from encouraging the suppression of speech in a manner which 'can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *A.F. ex rel. Fenton v. Kings Park Centr. Sch. Dist.*, 341 F. Supp. 3d 188, 201 (E.D.N.Y. 2018) (quoting *Zieper v. Metzinger*, 474 F.3d 60, 65–66 (2d Cir. 2007)). However, "not every assertion of a chilling effect will be considered a judicially cognizable First Amendment violation." *Id.* (quoting *Levin v.*

*Harleston*, 966 F.2d 85, 89 (2d Cir. 1992)); *see also Hayes v. Dahkle*, No. 16-cv-1368, 2017 WL

9511178, at *7, 2017 U.S. Dist. LEXIS 180424, at *21–22 (N.D.N.Y. Oct. 30, 2017) ("Verbal

harassment, absent injury, is generally insufficient to rise to the level of a constitutional

violation."). In *A.F.*, for example, the court found that the plaintiffs had not stated a plausible

First Amendment retaliation claim premised on a "disciplinary letter" which they argued a

"reasonable student" would perceive as a "threat of future punishment or retaliation if they were

to engage in [certain] activity in the future." 341 F. Supp. 3d at 201. The court held that the

plaintiffs had not adequately alleged a "present objective harm or the threat of some specific

future harm." *Id.*; *cf. Walker v. Senecal*, No. 20-cv-82, 2021 WL 3813081, at *8, 2021 U.S. Dist.

LEXIS 134229, at *19 (N.D.N.Y. July 19, 2021) (noting that, to constitute adverse action for the

purpose of a First Amendment retaliation claim, verbal threats must be "sufficiently specific").

Attorney Honeywell's comment that Mr. Bruce's "accusations [were] false, malicious and

unfounded, and really should not be repeated," (Dkt. No. 1, at ¶ 305), even if viewed as verbal

harassment or a threat directed at Plaintiff, is not sufficiently specific or serious to present a

"present objective harm or the threat of some specific future harm." *A.F.*, 341 F. Supp. 3d at 201.

Moreover, the Court finds that Plaintiff has not plausibly alleged that Attorney

Honeywell's comments at the November 2017 Board meeting had a subjective chilling effect on

her speech. The Complaint does allege that Plaintiff refrained from participating in the

graduation protest, initially refrained from sharing news of her college acceptance publicly,

withdrew from social activities, and was "reluctant and fearful" of discussing details of the

situation with others. (Dkt. No. 1, at ¶ 398; *see also* Dkt. No. 48, at 47). However, the Complaint

nowhere connects these alleged restrictions on her speech to Attorney Honeywell's comments at

the Board meeting in November 2017, as opposed to the many other adverse actions she alleges

Defendants took against her. In addition, these alleged restrictions on Plaintiff's speech occurred months after the November 2017 meeting and therefore are not plausibly linked to Attorney Honeywell's comments, especially as Plaintiff did in fact repeatedly exercise her First Amendment rights in the months shortly after Attorney Honeywell's comments. (*See, e.g.*, Dkt. No. 1, at ¶¶ 315, 322 (alleging she appealed to the Board and sought to address the Board in December 2017), 332 (alleging that she filed an appeal with the New York State Education Department in February 2018)); *see B.A. ex rel. M.G., Jr. v. City of Schenectady Sch. Dist.*, 209 F. Supp. 3d 515, 527 (N.D.N.Y. 2016) (dismissing First Amendment retaliation claim where, inter alia, "nearly five months passed between [the alleged protected] speech and the only allegedly adverse action identified" and finding that the Court's decision was "reinforced by the fact that [the alleged adverse action] apparently did nothing to chill" either the student's or the parent's speech).

For the same reasons, the Court also finds that Plaintiff has not stated a First Amendment retaliation claim against Attorney Honeywell for his statement in the *Times Union* article regarding the graduation protest, which is the same as the comment given at the Board meeting. Plaintiff has failed to plausibly allege any adverse action regarding this statement. The statement is not sufficiently specific or serious to present a "present objective harm or the threat of some specific future harm," *A.F.*, 341 F. Supp. 3d at 201, and therefore is not an adverse action for purposes of Plaintiff's retaliation claim.

Accordingly, the Court grants Attorney Honeywell's motion to dismiss Plaintiff's First Amendment retaliation claim against him.[25]

---

[25] The Court therefore need not address Attorney Honeywell's argument that he is entitled to qualified immunity.

**V.      LEAVE TO AMEND**

In her opposition, Plaintiff requests leave to amend her Complaint. (Dkt. No. 48, at 70). If

Plaintiff seeks leave to file an amended complaint, she must file a letter brief not more than 15

pages long, by February 22, 2022, explaining what amendment she seeks to make, with caselaw

support. The District Defendants and Defendant Honeywell may each respond to Plaintiff's

letter, in a letter brief not more than 15 pages, by March 8, 2022. The Court will determine

whether to permit an amendment following this briefing.

**VI.     CONCLUSION**

For these reasons, it is hereby

**ORDERED** that Defendants City School District of Albany, City School District of

Albany Board of Education, Lori McKenna, Dale Getto, and Anne Savage's motion to dismiss

(Dkt. No. 35) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Plaintiff's Fourteenth Amendment Due Process claim is **DISMISSED**

without prejudice; and it is further

**ORDERED** that Plaintiff's claims for injunctive relief changing District policies and

regulations are **DISMISSED** without prejudice for lack of standing; and it is further

**ORDERED** that Defendants City School District of Albany, City School District of

Albany Board of Education, Lori McKenna, Dale Getto, and Anne Savage's motion to dismiss

(Dkt. No. 35) is otherwise **DENIED**; and it is further

**ORDERED** that Defendant Jeffrey Honeywell's motion to dismiss (Dkt. No. 41), is

**GRANTED**.

**IT IS SO ORDERED.**

Dated:  <u>February 7, 2022</u>
            Syracuse, New York

Brenda K. Sannes
U.S. District Judge